ORVILLE MILK COMPANY,
Defendant-Appellant,

v.

Donald and Crystelyn BELLER,
Plaintiffs-Appellees,

v.

TAYLOR RENTAL SERVICE OF
GOSHEN, Indiana,
(Cross-Appellant) Appellee.

No. 3–185A20.

Court of Appeals of Indiana,
Third District.

Dec. 16, 1985.

James M. Miller, South Bend, for defendant-appellant.

Jerry E. Huelat, R. Kent Rowe, Rowe & Laderer, South Bend, for plaintiffs-appellees.

Thomas D. Blackburn, Robert J. Palmer, May, Oberfell, Helling & Lorber, South Bend, for (cross-appellant) appellee Taylor Rental Service of Goshen, Ind.

HOFFMAN, Judge.

Appellant Orville Milk Company and cross-appellant Taylor Rental Service of Goshen (Taylor Rental) appeal from the judgment entered upon the jury's verdict in favor of appellees Donald and Crystelyn Beller. Donald Beller had been injured while performing work for his employer, Walker Stainless Steel Equipment Corporation (Walker Stainless), on the Orville Milk project.

The evidence most favorable to the judgment is as follows:

Orville Milk Company is the owner of a dairy in Goshen. In 1978, it decided to expand its milk production facility. The new addition was to be a two-story building, approximately 140 feet long by 40 feet wide and 70 feet high, with the drop from the second floor to the first floor being approximately 30 feet. The second floor of the new addition was to house a milk dryer.

The general contractor of the project was Richard Van Ooteghem & Sons. Marriott Walker Corporation, an engineering firm, was to build the dryer, and Walker Stainless, a corporation engaged in the business of making milk dryers, was to install it. In September 1979, when Walker Stainless first went to Goshen to work on the Orville Milk project, Donald Beller was employed by Walker Stainless as a "key man." As a key man, Beller was the boss of a five-man crew. His crew consisted of himself, Dale

Benson, Donnie Stottinger, John Thornsen, and an unnamed fifth individual.

As winter approached, it became apparent to Orville Milk that Beller and his crew would need heat on the second floor where they worked. Orville Milk was contractually obligated to provide the heat. Lowell Lechlitner was employed by Orville Milk as its plant engineer and maintenance superintendent. Lechlitner initially placed one portable "salamander-type" heating unit on the second floor. This unit (unit one herein) was owned by Orville Milk and had been purchased from Farm Fleet and Supply of Goshen. The heat provided by unit one was inadequate and additional heat was requested. Lechlitner went to Taylor Rental on November 30, 1979, and rented two additional salamander heaters. When Lechlitner rented the two heaters, (unit two and unit three herein) he did not tell Taylor Rental the purpose for which he was renting the units. He signed a rental agreement which contained the following language on its reverse side:

"3. Responsibility for Use.

From the time the rented item(s) is taken until its return Lessee is responsible for the item and its use. The Lessee assumes all risks inherent in the operation and use of the item and agrees to assume the entire responsibility for the defense of, and to pay, indemnify and hold the Lessor harmless from and hereby releases the Lessor from any and all claims for damage to property or bodily injury (including death) resulting from the use, operation or possession of the item, whether or not it be claimed or held that such damage or injury resulted in whole or in part form Lessor's negligence, from the defective condition of the item or from any cause. Lessee agrees that no warranties, expressed or implied, have been made in connection with this rental."

Lechlitner knew that certain provisions were contained on the reverse side of the agreement, but he did not read them.

Beller testified that he observed the two rented heaters were covered with dirt, grease and cement. Shortly after all three heaters were being used concurrently, Beller and his crew noticed fumes coming from them. In addition, unit three was spitting out some type of mist. Beller complained to both Lechlitner and an Orville Milk engineer about this. As long as Beller and his crew stayed clear of the heaters, the fumes did not bother them too badly. When his crew reported for work the next day, Saturday, December 1, 1979, they noticed no change in the conditions. In fact, in order to perform work on a platform in front of the dryer, Beller had to turn off and move unit three. That heater bothered him greatly when he was working around the mist which it was emitting. The odor of the fumes could be smelled in the whole building and the odor irritated Beller's nose, dried his throat, and burned his eyes. Lechlitner had personal knowledge that unit one was emitting fumes, and that such was an indication the heater was a dangerous thing.

As stated previously, the second floor upon which Beller and his crew were constructing the milk dryer was 30 feet above the building's main floor. The second floor was made of concrete and brick, and until November 25, 1979, the only means of gaining entrance to the floor was by way of an extension ladder which protruded through a 12 foot by 24 foot access hole on the second floor. Beller and his crew also used this access hole for hoisting all of the large pieces of the milk dryer up to their work area. When the access hole was not being used for bringing up materials, it was covered by three steel plates. On November 25, 1979, a stairway was put into operation on the far opposite end of the new addition.

On Saturday, December 1, 1979, Beller and his crew removed the three steel plates from the access hole in order to hoist up certain equipment. The last thing done by John Thornsen of Beller's crew, before leaving on Saturday night, was to put the plates back in place. In order to cover that portion of the hole which the ladder prevented the steel plates from covering, he placed a sheet of plywood, then a wood

pallet, and then laid a piece of cardboard on top of that to prevent cold drafts from coming through the pallet. Both Thornsen and Donnie Stottinger then stepped on the pallet and it supported their weight. After refueling the salamanders so they would continue to heat the work area overnight, Beller's crew departed the second floor by way of the stairway.

Late that Saturday night, sometime around midnight, Lechlitner returned to the new addition in order to refuel unit one. He first filled a five-gallon bucket with kerosene and then proceeded to climb up the ladder to the second floor. While his testimony of the wood and/or cardboard covering the access hole varied from that of Thornsen, the jury must determine which party· to believe, and this Court is bound by that determination. In addition, Lechlitner stated that another Orville Milk employee was in the building that evening and the jury may have found that neither Thornsen nor Lechlitner were lying, but inferred that the other Orville Milk employee may have altered the opening cover. Nevertheless, Lechlitner pushed the cover aside and completed his task. When he left the second floor, "[t]he cardboard was put back down and secured like slid underneath the plywood just like I found it...." He thought such condition was unsafe, but left it that way. Lechlitner descended by way of the stairway.

When Beller and his crew arrived at 7:00 A.M. on Sunday, December 2, 1979, they all used the stairway to get to the second floor. Around 9:00 A.M., Beller told Thornsen that they were going to leave due to the "stinging of the eyes, and dryness of the throat and stuff," caused by the heaters' fumes. Thornsen's eyes were also watering and irritated from the fumes. At this time, Beller had one piece left to weld. As soon as he finished welding that piece, he took his hood off and shut off the welder. He then began to rub his eyes because they were stinging. His next recollection is of waking up in the hospital one or two days later.

Thornsen observed Beller welding this last piece. He saw Beller finish welding and then remove his helmet. Beller started rubbing his eyes and then took a couple steps. Thornsen turned away and then suddenly felt the steel plates which he was sitting upon vibrate. He quickly looked up and saw Beller falling through the hole which he had covered the night before. Thornsen immediately climbed down the ladder to aid Beller.

Once emergency medical personnel had arrived, cared for Beller, and then departed with him, Thornsen returned to the work area. He first noticed that the cardboard which had been used to cover the opening was lying on the first floor. He then noticed that the pallet and plywood which he had used to cover the opening the night before, were lying together away from the opening.

Experts were able to form opinions based upon all of the facts that the salamander heaters were emitting carbon monoxide fumes, and that at the time of his fall, Beller was under the influence of carbon monoxide intoxication.

Donald Beller brought this action against various parties in order to receive damages for his injuries. His wife, Crystelyn Beller, sought damages for loss of consortium. Several defendants were named in the action; however, only the Bellers, Orville Milk and Taylor Rental are parties to this appeal. As the only disputes regarding Beller's fall stem from the Bellers' claim against Orville Milk, those claims, as listed in the pre-trial order, are as follows:

A. Negligence in its

1. Failure to provide the proper operation and ventilation of the salamander heating units;

2. Failure to cover and close or to erect barriers around holes and openings at the construction work site;

3. Failure to supervise and coordinate the activities of employees and other contractors at the construction site; and

4. Failure to warn Beller of the likelihood of injury as a result of the inhala-

tion of toxic fumes emanating from the salamander heaters located in the work area.

B. Failure to provide a safe place to work and that as a result of its negligence, Beller was injured.

In addition, Taylor Rental filed a cross-claim against Orville Milk seeking indemnification as to any judgment entered against it, claiming such indemnification was due pursuant to the terms of the lease agreement for the two salamander heaters. After trial, the jury found in favor of the Bellers and against both Orville Milk and Taylor Rental, and judgment was entered. Prior to trial, the court denied Taylor Rental's motion for summary judgment on its indemnification issue, and later granted Orville Milk's motion to dismiss the claim, such motion, however, being treated as a motion for judgment on the evidence.

On appeal from the final judgment, Orville Milk raises several issues for this Court's review:

(1) whether Orville Milk owed any duties to Donald Beller;

(2) whether the breach of any duty by Orville Milk was a proximate cause of Donald Beller's injuries;

(3) whether Donald Beller was contributorily negligent; and

(4) whether the trial court erred in refusing to give certain instructions tendered by Orville Milk.

Taylor Rental raises two additional issues:

(1) whether the trial court erred in denying Taylor Rental's motion for summary judgment on its cross-claim against Orville Milk for indemnification pursuant to a lease agreement; and

(2) whether the trial court erred in granting Orville Milk's motion for judgment on the evidence on Taylor Rental's cross-claim for indemnification.

■■ Orville Milk initially contends that it is not chargeable with any duties toward Donald Beller. The law, though, is that a landowner has a common-law duty to exercise care to keep his property in a reasonably safe condition for business invitees, including employees of independent contractors. *Wingett v. Teledyne Industries, Inc.* (1985), Ind., 479 N.E.2d 51, 54. This obligation exists where an injury is reasonably foreseeable in light of the hazardous nature of the instrumentalities maintained by the party on his premises. However, where the instrumentality is that of an independent contractor, the complainant must show either that the landowner assumed control of the instrumentality or had superior knowledge of the potential dangers involved in its operation. *Plan-Tec, Inc. v. Wiggins* (1983), Ind.App., 443 N.E.2d 1212.

■ In support of its contention, Orville Milk argues that it did not exercise control over the ladder, access hole opening or the salamander heaters, and that it did not have superior knowledge of the dangers or risks. However, Lechlitner's testimony that he was aware of the heater's fumes and that such signaled danger, and that he knew the condition which he left the access hole opening in after refueling the salamanders at midnight was unsafe, supports an inference of superior knowledge of the dangers. In fact, only Lechlitner knew of the unsafe condition of the access hole's covering. Orville Milk's argument is, in effect, a request of this Court to reweigh the evidence, a function which this Court is unable to perform. Thus, Orville Milk's first contention fails.

■ Orville Milk's second contention is that Donald Beller's injuries were not proximately caused by any act or omission on its part. Proximate cause is commonly defined as that cause which, in natural and continuous sequence, unbroken by any efficient intervening cause, produces the result complained of and without which the result would not have occurred. *Ortho Pharmaceutical v. Chapman* (1979), 180 Ind.App. 33, 388 N.E.2d 541.

■ The record discloses Orville Milk's knowledge of the dangers and risks, and that acts by Orville Milk's employee created dangers which only he knew of (leav-

ing the access hole opening's covering in an unsafe condition). It also discloses that Orville Milk was on notice of the fumes and mist being emitted by the heaters, yet did nothing to correct the problem or improve ventilation. In addition, experts testified that the salamanders were emitting carbon monoxide and that at the time of his fall, Beller was under the influence of carbon monoxide intoxication. Again, Orville Milk would have this Court reweigh the evidence which was before the jury, but as there is some evidence to support a finding of proximate cause, the jury will not be second-guessed.

Orville Milk also contends that Donald Beller was contributorily negligent and therefore, he is precluded from recovering.

■ It is well settled that contributory negligence is generally a question of fact for the jury where the facts are such as to be subject to more than one reasonable inference. However, where the facts are undisputed and only a single inference can reasonably be drawn therefrom, the question of contributory negligence becomes one of law. Our courts have consistently held that the basis for contributory negligence is conduct on the part of the plaintiff which falls below the standard for which he should conform for his own protection and safety. Lack of reasonable care that an ordinary person would exercise in like or similar circumstances is the factor upon which the presence or absence of negligence depends. Further, it must be shown that the plaintiff's negligent act was a proximate cause of his injury and that he was actually aware of or should have appreciated the risks involved. Indiana courts have found contributory negligence as a matter of law in cases in which the voluntary conduct of the plaintiff exposed him to imminent and obvious dangers which a reasonable man exercising due care for his own safety would have avoided. *Jones v. Gleim* (1984), Ind., 468 N.E.2d 205.

■ The evidence contained in the record shows that Beller was not aware of the risks. He had no previous experience with salamander heaters and while he was aware they were emitting fumes, he did not know they were toxic carbon monoxide fumes. Nor was he aware of the danger of the access hole opening that day. After leaving the premises the night before, the opening was securely covered. Beller knew of that fact and had no reason to question it on the day of his fall. While the jury found that Beller was not contributorily negligent, this Court is unable to determine that all the facts and the reasonable inferences point in the opposite direction. Thus, the jury's decision must be sustained.

■ The last issue raised by Orville Milk addresses the trial court's refusal to give Orville Milk's tendered Instructions Nos. 3 and 4. In determining whether the refusal to give instructions constitutes error, this Court considers 1) whether the tendered instruction is a correct statement of the law, 2) whether there is evidence in the record to support the giving of the instruction, and 3) whether the substance of the tendered instruction is covered by other instructions which were given. *Shull v. B.F. Goodrich Co.* (1985), Ind. App., 477 N.E.2d 924.

Orville Milk's tendered Instruction No. 3 reads as follows:

"In this case, Defendant Orville Milk Company, as a landowner or occupier, owed a duty to Donald Beller to exercise reasonable care to maintain the premises in a reasonably safe condition. The Defendant Orville Milk Company has not breached that duty if, at the time of his injuries, Donald Beller was aware or should have been aware that the premises where he was working were not safe. Therefore if you find that Donald Beller appreciated and had knowledge, prior to his injuries, of the risks attending the work he was to perform, then Defendant Orville Milk Company has not breached the duty it owed to Beller."

This instruction is an accurate statement of the law in both its definition of Orville Milk's duty to Beller, *Wingett, supra,* and

its expression, in essence, of the effect of Beller's contributory negligence, *Jones, supra.* However, the definition of Orville Milk's duty was covered by plaintiff's tendered Instruction No. 5, which was given to the jury. In addition, the portion of Orville Milk's instruction dealing with the effect of Beller's contributory negligence was covered in its tendered Instruction No. 5, which was also given to the jury. Therefore, the court's refusal to give Orville Milk's tendered Instruction No. 3 was proper.

Orville Milk's tendered Instruction No. 4 states:

"The Plaintiff Donald Beller has asserted a claim that the Defendant Orville Milk Company failed to provide him with a safe place to work. In Indiana, the owner of a building is not under a duty to see that precautions are taken to avoid all probable injury to the employees of independent contractors working on the property of the owner.

Similarly, the duty of an owner of a building to provide to the employees of an independent contractor a safe place to work does not extend to or relate to instrumentalities within the sole control of the independent contract's employees."

■ This tendered instruction is also an accurate statement of the law. *Hale v. Peabody Coal Co. et al.* (1976), 168 Ind. App. 336, 343 N.E.2d 316. Yet as the instruction precisely places a duty on a contractee, *Hale* further defines that duty as "an affirmative duty to exercise ordinary care to keep the property in a reasonably safe condition." *Id.* at 347, 343 N.E.2d at 325. This statement was covered in plaintiff's tendered Instruction No. 5 which was given to the jury. In addition, there is no evidence to support a finding that the dangerous instrumentalities were within the "sole control" of Beller. Therefore, the trial court properly refused this instruction.

This Court now turns to those issues raised by cross-appellant Taylor Rental. The first contention urged by Taylor Rental is that the trial court erred in denying Taylor Rental's motion for summary judgment on its cross-claim against Orville Milk for indemnification pursuant to the lease agreement which Lechlitner entered into on behalf of Orville Milk with Taylor Rental.

On review of a denial of summary judgment, this Court must determine if there exists any genuine issue of material fact. Any doubt about the existence of a genuine issue of material fact must be resolved against the moving party. Moreover, even if the facts are undisputed, summary judgment is inappropriate when the evidence before the court reveals a good faith dispute as to the inferences to be drawn from those facts. *Ogilvie v. Steele by Steele* (1983), Ind.App., 452 N.E.2d 167.

■ Initially, it is noted the trial court determined that IND. CODE § 26–2–5–1 does not apply. That Code section provides that certain indemnification clauses are void and unenforceable. However, the section is specifically limited to those clauses contained in or collateral to construction or design contracts. As the lease agreement between Orville Milk and Taylor Rental was not a construction or design contract, the trial court was correct in ruling that IND. CODE § 26–2–5–1 does not apply.

■ Next this Court must consider whether the indemnity provision was ambiguous or whether it clearly and unequivocally covered the type of claim which was made by the Bellers against Taylor Rental. The Bellers' claims against Taylor Rental rested on both a product liability and a failure to warn theory. In the pre-trial order they contended that the salamander heaters were placed in the market by Taylor Rental in a defective condition, and without adequate warnings. The indemnification clause in the lease agreement specifically provides that Orville Milk will "pay, indemnify and hold [Taylor Rental] harmless from and hereby releases [Taylor Rental] from any and all claims for damage ... result[ing] ... from Lessor's negligence, [or] from the defective condition of the item...." It is therefore, clear that the indemnity provision did cover the

claims made by the Bellers.[1] Based upon the foregoing, summary judgment on Taylor Rental's cross-claim would be proper only if all of the pleadings, depositions, answers to interrogatories and admissions filed with the trial court at the time, showed that Orville Milk knowingly and willingly entered into the indemnity agreement. *Ogilvie, supra.*

In *Weaver v. American Oil Co.* (1971), 257 Ind. 458, 276 N.E.2d 144, our Supreme Court discussed the "knowingly and willingly" requirement and refused to enforce a clause in a lease agreement which exculpated the lessor, American, from liability and in which the lessee, Weaver, agreed to indemnify American. In his dissent, Justice Prentice recited the general rule that a person who signs a contract, without bothering to read the same, will be bound by its terms. The *Weaver* majority carved an exception into the general rule. The Court stated:

> "When a party can show that the contract, which is sought to be enforced, was in fact an unconscionable one, due to a prodigious amount of bargaining power on behalf of the stronger party, which is used to the stronger party's advantage and is unknown to the lesser party, causing a great hardship and risk on the lesser party, the contract provision, or the contract as a whole, if the provision is not separable, should not be enforceable on the grounds that the provision is contrary to public policy."

*Id.* at 464, 276 N.E.2d at 148. The Court also stated that once this burden was met, the lessor must show the provision was explained and was understood and agreed to by the lessee.

In *Weaver*, there was evidence that Weaver had attended high school for one and one-half years and from that he could not be held to know the law or understand technical language. At the time he signed the lease agreement, he was merely instructed to "sign." There was no indication that he had read the indemnification provisions, had been asked to read them, or that they had been explained to him. The lease was prepared by American's attorneys. The indemnity provisions were in fine print and did not have any title heading. Based upon these factors, the Court found the indemnity provisions could not be applied. The Court further stated that today, the weaker party, in need of goods or services, is frequently not in a position to shop around for better terms, either because the author of the standard contract has a monopoly or because all competitors use the same clauses.

■ The evidence before the trial court when it ruled on the motion for summary judgment was that Orville's agent was a high school graduate and had attended some trade schools. He was their plant manager and building superintendent for 23 years. He frequently rented items from Taylor Rental. He knew that the reverse side of the lease agreement contained additional terms. The front of the lease agreement stated as follows immediately above the space for signature:

> "THE BACK OF THIS CONTRACT CONTAINS IMPORTANT TERMS AND CONDITIONS, INCLUDING LESSOR'S DISCLAIMER FROM ALL LIABILITY FOR INJURY OR DAMAGE AND DETAILS OF LESSEE'S OBLIGATIONS FOR RENTAL CHARGES AND RESPONSIBILITIES TO CARE FOR AND RETURN THE ITEMS RENTED. THEY ARE A PART OF THIS AGREEMENT—READ THEM.
>
> \*   \*   \*   \*   \*   \*
>
> I ACKNOWLEDGE RECEIPT IN GOOD ORDER OF THE ABOVE ITEMS, AND CERTIFY THAT I HAVE READ AND AGREE TO ALL TERMS OF THIS AGREEMENT."

On the document's signature line, Lechlitner signed his name. There was no evidence that Orville Milk was precluded from

---

1. Also, see the discussion of the effect of a broad indemnity provision which this Court found unambiguous and applicable in *Fort*

*Wayne Cablevision v. Ind. & Mich. Elec.* (1983), Ind.App., 443 N.E.2d 863.

shopping around, that Taylor Rental had a monopoly or that all competitors used the same indemnification clauses. In addition, the indemnification provision was in print size as large as that on the rest of the agreement and had a proper title. Therefore, as a matter of law, Orville Milk failed to put any evidence before the trial court that it was in a lesser bargaining position and subsequently, that it did not knowingly and willingly accept and agree to the indemnity provision. As a result, the trial court erred in denying Taylor Rental's motion for summary judgment. The court is thus ordered to amend its final judgment accordingly. Inasmuch, it is not necessary to address Taylor Rental's second contention.

Affirmed in part and reversed in part.

STATON, P.J., and GARRARD, J., concur.