Norman McMUNN, Plaintiff,

v.

**HERTZ EQUIPMENT RENTAL CORPO-
RATION, Defendant,
Third-Party-Plaintiff-Appellee,**

v.

**EICHLEAY CORPORATION,
Third-Party-Defendant-Appellant.**

No. 85–2502.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 26, 1986.

Decided May 20, 1986.

Carl N. Carpetner, Galvin, Galvin & Leeney, Hammond, Ind., for third-party-defendant-appellant.

Joseph Stalmack, Hammond, Ind., for defendant, third-party-plaintiff-appellee.

Before BAUER and POSNER, Circuit Judges, and FAIRCHILD, Senior Circuit Judge.

POSNER, Circuit Judge.

This appeal requires us to consider a difficult issue of Indiana law pertaining to indemnity contracts—provided we satisfy ourselves that we have jurisdiction of the appeal.

McMunn was injured at a construction site while operating a "bobcat loader" that his employer, Eichleay, a construction contractor, had leased from Hertz and was using in the performance of a construction contract with Inland Steel. McMunn sued Hertz in state court, charging it with negligence in having failed to discover that the loader was defective. Hertz removed the case to federal court on the basis of diversity of citizenship and then impleaded Eichleay under Rule 14(a) of the Federal Rules of Civil Procedure, pointing out that the lease contained a clause in which Eichleay had promised to indemnify Hertz for the consequences of any tort suit brought

against Hertz arising out of the lease. Eichleay defended on the ground that the clause was invalid under Indiana law. The district court disagreed and granted summary judgment for Hertz on its third-party complaint. The court then directed the entry of judgment against Eichleay, accompanied by a finding that there was no just reason for delay. This was done so that Eichleay could take an immediate appeal under Rule 54(b) of the Federal Rules of Civil Procedure even though McMunn's suit against Hertz remained (and remains) pending in the district court.

■ Rule 54(b) allows an immediate appeal from a judgment that resolves a separate claim, or a dispute with a separate party, even though the rest of the litigation is still going on in the district court. The judgment for Hertz resolves Hertz's claim against Eichleay, but the question is whether it does so finally, given that the judgment cannot become final *even as between these two parties* until the dispute with McMunn is resolved. If Hertz wins, there will be no damage judgment for Eichleay to indemnify; even if Hertz loses, until that happens and Hertz's liability to McMunn is thereby both established and quantified, Eichleay will not know how much it owes Hertz. Although Rule 54(b) dispenses with finality in the sense of completion of the entire litigation, it still requires finality as to the separate claim, or the dispute between separate parties, in regard to which the judgment sought to be appealed under the rule is entered. The rule says this; and so does 28 U.S.C. § 1291, which circumscribes the rule, see Fed.R.Civ.P. 82. Of course the word "final" is not self-defining; its meaning depends on practical considerations such as that the federal courts of appeals do not have time to decide appeals that may become moot because the order sought to be appealed is conditional on an event that may never come to pass. A contingent judgment is not final till the contingency materializes. *Freeman v. Kohl & Vick Machine Works, Inc.*, 673 F.2d 196, 200 (7th Cir.1982) (per curiam); *Minnesota v. Pickands Mather & Co.*, 636 F.2d 251, 253 (8th Cir.1980); *Williams v.*

*Ford Motor Credit Co.*, 627 F.2d 158, 160–61 (8th Cir.1980); cf. *Allegheny Airlines, Inc. v. LeMay*, 448 F.2d 1341, 1343 (7th Cir.1971) (per curiam).

■ Admittedly, this strong conclusion is inconsistent with several cases, cited in 6 Moore's Federal Practice ¶ 54.36, at p. 605 n. 12 (2d ed.1985) (and see additional citations in the 1984–1985 Cum.Supp. to Moore's), which have allowed the use of Rule 54(b) to make an order dismissing a third-party claim appealable immediately. But they may be distinguishable from a case such as this where the order grants the third-party claim. An order dismissing a third-party claim is definitive as to the third-party defendant; he is out of the case. An order granting such a claim keeps the third-party defendant in the case until the case is over and the defendant knows how much if anything he must pay, for until the main claim is adjudicated the amount to be indemnified by the third-party defendant will be unknown. To allow an appeal from such an order might therefore violate the rule that an order which determines liability but not damages is not a final decision on the claim. See, e.g., *Dimmitt & Owens Financial, Inc. v. United States*, 787 F.2d 1186, 1190 (7th Cir.1986), and cases cited there. There is, however, an exception to this rule for cases where the computation of damages is mechanical, and therefore unlikely to produce a second appeal. See *Parks v. Pavkovic*, 753 F.2d 1397, 1401–02 (7th Cir.1985), and cases cited there. The relevance of a second appeal's being unlikely is that the main reason for forbidding interlocutory appeals is to prevent the same case from generating more than one appeal. An order to indemnify fits the exception because the amount to be indemnified will be determined automatically by the judgment on the main claim.

■ Despite this point—which may seem to erase the distinction, so far as appealability is concerned, between orders granting and denying third-party claims—the cases that allow immediate appeal under

Rule 54(b) from orders denying third-party claims may be distinguishable from cases such as this where the order grants such a claim. In both types of case a powerful objection to allowing an immediate appeal is that the order will be moot if the main claim is dismissed; but in the first type the order really is final as to the third-party defendant, while in the second he must wait around till the case ends.

The appeal in the present case, however, is saved by the fact that the judgment granting the third-party claim is only partially contingent on the success of the main claim and will therefore not be moot even if the main claim is dismissed. For the indemnity clause not only requires Eichleay to make good any damages that McMunn may collect from Hertz; it requires Eichleay to pay Hertz the expenses of defending against McMunn's suit. Those expenses will be incurred—some of them have been incurred already—whether or not McMunn wins his suit. It is true that if he loses after Hertz has incurred only modest expenses in defense, the amount that Hertz can realize on the judgment on its third-party complaint may be so small that Eichleay may not consider the judgment worth appealing. In this sense an element of contingency pervades the entire appeal even though the judgment imposes an unconditional obligation on Eichleay. The full monetary value of the obligation is unknown and may in the end be small, although it will be computable mechanically and is therefore not indefinite in the sense in which an order that determines liability but not damages normally is indefinite and therefore not immediately appealable.

▮ Nevertheless the unconditional element prevents us from dismissing the appeal. We have no discretion to turn down an appeal in a case to which Rule 54(b) applies and in which the district judge certifies a judgment for immediate appeal under the rule; and unless the application of the rule is to become even more complex than it is already, a judgment that is only partially contingent should be held to be within the rule's scope and hence appealable to us as a matter of right once the district judge enters judgment under Rule 54(b), as he did here.

So we come to the merits. Indemnity agreements are a common device for shifting the burden of liability from a tortfeasor to someone better able to bear the burden. The someone may be an insurance company that is able to spread the risk better than the tortfeasor or it may be another tortfeasor, who could have prevented the accident at lower cost than the indemnitee. The latter characterization seems to fit this case. McMunn claims that Hertz was negligent in failing to notice the loader's (alleged) defect when Hertz inspected the loader before leasing it to Eichleay. But the parties to this dispute have stipulated that Hertz had no idea what Eichleay was going to do with the loader—didn't even know that Eichleay is in the construction business. Eichleay on the other hand used the loader, presumably knew the stresses that it would be subject to on the job and the dangers it might pose to workmen, also knew their capacities for safety, and all things considered was in a better position than Hertz to prevent this accident—or so at least the parties may have thought when they signed the indemnity agreement. Thus the agreement may well concentrate the costs of the accident on the party that could have avoided them at lowest cost.

The rub is a statute which, if read literally, would make the agreement unenforceable. Section 26–2–5–1 of the Indiana Code provides that "All provisions, clauses, covenants, or agreements contained in, collateral to, or affecting any construction or design contract except those pertaining to highway contracts, which purport to indemnify the promisee against liability for ... death or bodily injury to persons ... from the sole negligence or willful misconduct of the promisee ..., are against public policy and are void and unenforceable." The indemnity clause in this case is within the scope of the statute if the clause is deemed to "affect" the construction contract be-

tween Eichleay and Inland Steel in the performance of which McMunn was injured.

There is no published legislative history of Indiana statutes, no unpublished history was presented in this case, and no reported case interprets the statute in a setting such as we have here. But even without these aids we can see in a general way why "affecting" was put in. Without it there would be a tremendous loophole: the parties to a construction contract could easily evade the statute by making a separate indemnity agreement. But whenever legislative draftsmen try to close a loophole by adding general language (the "collateral" and "affecting" clauses), they create the danger that the statute will be interpreted very broadly; general language invites broad readings. Certainly the word "affecting" does. In an interrelated economy almost everything affects everything else. A farmer who consumes the crop that he grows nevertheless affects the supply of the crop, and if the crop is traded in a national market the market price may be affected 3,000 miles from his farm. On reasoning such as this the growing of crops for home consumption was held to affect interstate commerce. See *Wickard v. Filburn*, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942). An indemnity agreement between the manufacturer of spark plugs used in a General Motors truck and General Motors could affect a construction contract in the performance of which the truck was used. Maybe the Indiana legislature meant to go so far, but this cannot be inferred just from the use of general language which so far as appears was included merely to plug a loophole.

We can get some help from *Fort Wayne Cablevision v. Indiana & Michigan Electric Co.*, 443 N.E.2d 863 (Ind.App.1983), where the Indiana Court of Appeals explained that the purpose of the statute is to increase safety at construction sites. Before it was passed general contractors would negotiate with their subcontractors for a promise to indemnify the general contractor if he was sued for a personal injury to a worker employed by a subcontractor at the construction site. The legislature believed that this type of agreement resulted in more accidents on the job. This is possible, certainly. If the general contractor can shift the financial burden of liability he may have less incentive to take measures to make the construction site safe. Of course he will have to compensate the subcontractors for imposing a greater risk of liability on them, and thus will pay a price for his carelessness. But in just the same way, a person who becomes more careless because he has liability insurance may in the end have to pay for his greater carelessness in the form of a higher premium for insurance, yet the buffering of liability by the insurance company may result in some additional carelessness. This would not matter if tort compensation were always full compensation. For then the victims of this extra carelessness would be no worse off, while the insured and insurer (or indemnitee and indemnitor—in fact liability insurance is just a special form of indemnity) would be better off; otherwise they would not have made the contract. See Shavell, *On Liability and Insurance*, 13 Bell J. Econ. 120 (1982). But tort compensation is not always full compensation, and when it is not the victims may be worse off.

A further point in the construction setting is that workers' compensation has displaced conventional tort liability for employees, who are the people most likely to be hurt in construction accidents, and workers' compensation awards are lower than tort awards—though also easier to get, making the net comparison with conventional tort liability unclear. A final twist is that, precisely because they are employees, and thus in a contractual relationship, direct or indirect, with their potential injurers, construction workers may be compensated by a higher wage for any greater risk of injury that is due to an indemnity clause. See Coase, *The Problem of Social Cost*, 3 J.Law & Econ. 1 (1960). There is much evidence that workers demand and receive such compensation. See, e.g., Viscusi, Risk by Choice: Regulating Health and Safety in the Workplace, ch. 3

(1983); Olson, *An Analysis of Wage Differentials Received by Workers on Dangerous Jobs,* 16 J. Human Resources 167 (1981). But the compensation may not be adequate, because of lack of information or other frictions. So, in sum, it is possible to understand how the Indiana legislature might have believed that banning indemnity agreements might make construction workers safer; whether its belief was correct or not is none of our business.

 If this is the policy behind the statute, it would be but weakly engaged by applying the statute to the present case. The bobcat loader is not used just in nonhighway construction. It is also used in highway construction (excluded by the statute) and for nonconstruction uses altogether, such as removing snow. We do not know what percentage of bobcat loaders leased by Hertz is used for nonhighway construction, and suppose it is small. Then the effects on Hertz's safety incentives of invalidating its indemnity agreements when the loader happens to be used for nonhighway construction will be negligible. Hertz will not make appreciably more careful inspections on the off chance that the loader might be put to a use for which it would not have indemnity. Of course there may be cases where the equipment supplied to the party to the construction contract is specialized to nonhighway construction or otherwise clearly intended for it. Then the safety incentives of the supplier might be enhanced by forbidding indemnity. So we do not hold that the statute can never be applied to a person who is not a party to the construction contract itself. See *American Pecco Corp. v. Concrete Bldg. Systems Co.,* 392 F.Supp. 789, 793–94 (N.D.Ill. 1975). But the supplier of a nonspecialized good who has no (other) basis for thinking that the good will be used in construction is not within the scope of the statute. The statute is directed at a particular problem, construction safety, from which the indem-

nity agreement in the present case is remote.

Obviously much guesswork is involved in this conclusion, as so often in interpreting statutes. Statutes are drafted in haste and sometimes carelessly, by busy legislators concerned with a particular problem but also concerned not to draft their statute so narrowly that it opens gaping loopholes. When they use general language they create a potential for application to situations unforeseen by them and remote from their purposes, and then it is the task of courts by imaginative interpretation to keep the statute within reasonable bounds, as we have tried to do—fortified by the knowledge that the district judge, a former Indiana judge, reached the same conclusion as we. See *Morin Building Products Co. v. Baystone Construction, Inc.,* 717 F.2d 413, 416–17 (7th Cir.1983).

AFFIRMED.