**LTV STEEL COMPANY, INC.,
Plaintiff–Appellant,**

v.

**NORTHWEST ENGINEERING & CONSTRUCTION, INC., and J. Hilding Johnson, a division of Northwest Engineering & Construction, Inc., Defendants–Appellees.**

No. 94–1658.

United States Court of Appeals,
Seventh Circuit.

Argued Oct. 25, 1994.

Decided Nov. 30, 1994.

Anthony DeBonis, Jr. (argued), Terrance L. Smith, Smith & DeBonis, East Chicago, IN, for plaintiff-appellant.

Robert P. Forszt (argued), Fred M. Stults, Jr., Stults, Custer, Kutansky & McClean, Gary, IN, for defendants-appellees.

Before CUDAHY, ESCHBACH, and EASTERBROOK, Circuit Judges.

ESCHBACH, Circuit Judge.

LTV Steel Company, Inc., ("LTV") brought an action against Northwest Engineering & Construction and J. Hilding Johnson ("Northwest") in federal court under 28 U.S.C. § 1332 (diversity) to collect funds owed on an indemnity agreement. LTV appeals the district court's grant of Northwest's motion for summary judgment and denial of LTV's partial motion for summary judgment, 845 F.Supp. 1295. For the reasons below, we affirm.

## I.

LTV is a New Jersey corporation with its principal place of business in Cleveland, Ohio. Northwest is an Indiana corporation. On May 17, 1990, LTV entered into a contract with Northwest for the provision of labor, materials, supervision, and equipment in the performance of general maintenance repairs at LTV's Indiana Harbor Works as directed by LTV's maintenance staff. The contract, which consisted of LTV's standard purchase order form and several attached pages, contained the following clause:

12. Personal Injury, Death and Property Damage—By its acceptance of this order, Seller expressly agrees to defend, indemnify and save harmless Buyer (as used in this Clause, "Buyer" means and includes LTV Steel Company and, as appropriate,

its subsidiaries and affiliates) from and against any and all liability, loss, damages, costs and expenses (including attorneys' fees), claims, suits and demands for any loss or damage to property or injuries to persons, including death, sustained by Buyer, its employees or its customers, or by Seller or its employees, or by any other party, arising out of the performance of any work or the furnishing of, or claimed defects in, any goods furnished by Seller under this order. Seller further expressly agrees that it is the intent hereof that Seller shall assume all risk of such loss, damage or injuries, and shall absolve and indemnify Buyer therefrom, whether or not such loss, damages, or injuries are due to the sole or joint negligence of Buyer or its employees.

LTV and Northwest both agree that the last sentence of this clause obligated Northwest to indemnify LTV against harm arising from LTV's sole negligence.

On May 22, 1990, LTV's maintenance staff asked Northwest to repair and replace wearplates in the coal hopper of a blast furnace at LTV's plant. The next day, Northwest sent a crew of its employees including ironworker Edward J. Ellch ("Ellch"), to complete this task. While performing welding and inner arching activities in the coal hopper, Ellch, overcome by either the fumes or a lack of oxygen, became unconscious and fell ten to twelve feet to the surface of the hopper floor and was injured. On August 6, 1990, Ellch filed suit against LTV in federal district court to recover for the injuries resulting from his fall. Relying upon the indemnification provision of its contract with Northwest, LTV requested on July 24, 1991, and again on August 16, 1991, that Northwest defend against Ellch's suit. Northwest refused on both occasions. Eventually, after incurring legal fees in excess of $24,000, LTV settled with Ellch for $72,500 in an agreement that denied any liability on the part of LTV.

On October 27, 1992, LTV brought suit in federal district court seeking enforcement of its indemnity provision with Northwest and recovery of all settlement costs and attorney's fees incurred in defending Ellch's suit.

Northwest answered with the affirmative defense that the indemnity provision was void under § 26–2–5–1 of the Indiana Code because it purported to indemnify LTV against its sole negligence in a construction or design contract. The parties filed cross motions for summary judgment, with LTV's motion limited to the issue of liability. On February 24, 1994, the district court denied LTV's motion for partial summary judgment and granted Northwest's motion for summary judgment. LTV filed a timely notice of appeal pursuant to 28 U.S.C. § 1291.

## II.

■ There are no genuine issues of material fact and the dispute primarily concerns a question of interpreting a statute and applying it to a specific set of facts. Thus, the issue was properly resolved on a motion for summary judgment. Fed.R.Civ.Proc. 56(c). The district court's grant of a motion for summary judgment, and the underlying interpretation of the statute in arriving at its decision, is reviewed *de novo*. *United States v. B & W Investment Properties*, 38 F.3d 362, 366 (7th Cir.1994); *Colip v. Clare*, 26 F.3d 712, 714 (7th Cir.1994).

## A.

■ The principal question on appeal is whether § 26–2–5–1 of the Indiana Code applies to the contract between LTV and Northwest and therefore operates to relieve Northwest of its obligation to indemnify LTV. The statute provides as follows:

All provisions, clauses, covenants, or agreements contained in, collateral to, or affecting any construction or design contract except those pertaining to highway contracts, which purport to indemnify the promisee against liability for:

(1) Death or bodily injury to persons;

(2) Injury to property;

(3) Design defects; or

(4) Any other loss, damage or expense arising under either (1), (2) or (3);

from the sole negligence or wilful misconduct of the promisee or the promisee's agents, servants or independent contractors who are directly responsible to the

promisee, are against public policy and are void and unenforceable.

LTV admits that the clause in its contract with Northwest indemnified LTV against liability arising from its sole negligence, but it argues that this statute does not apply to its contract with Northwest because it was not a "construction or design contract." Rather, it characterizes its contract as a "maintenance or repair contract," which LTV contends, under rules of statutory interpretation and principles of public policy, is separate and distinct from a construction or design contract. Thus, LTV concludes, the indemnity provision in its contract with Northwest is not covered by the statute.

■ It is not clear from the statute whether work which might be characterized as "maintenance" or "repair" is covered by the phrase "construction contract." Although there is no published legislative history of Indiana statutes, *see McMunn v. Hertz Equipment Rental Corp.*, 791 F.2d 88, 92 (7th Cir.1986), Indiana courts have had occasion to interpret the meaning and purpose of I.C. § 26–2–5–1. In a diversity case, our principal guide in interpreting and applying a state statute is the decisions of that state's courts. *See United States v. Thirty–Seven Photographs*, 402 U.S. 363, 369, 91 S.Ct. 1400, 1404–05, 28 L.Ed.2d 822 (1971); *DeGrand v. Motors Insurance Corp.*, 903 F.2d 1100, 1103 (7th Cir.1990); *Waldron v. McAtee*, 723 F.2d 1348, 1352 (7th Cir.1983). In the absence of a decision by the highest state court, "[d]ecisions of intermediate appellate state courts generally control unless there are persuasive indications that the highest state court would decide the issue differently." *L.S. Heath & Son v. AT & T Information Systems*, 9 F.3d 561, 574 (7th Cir.1993) (citing *Hicks v. Feiock*, 485 U.S. 624, 630 n. 3, 108 S.Ct. 1423, 1428 n. 3, 99 L.Ed.2d 721 (1988)).

In *Fort Wayne Cablevision v. Indiana & Michigan Electric Co.*, 443 N.E.2d 863 (Ind. Ct.App.1983), the Indiana Court of Appeals concluded that the purpose of the statute was to increase safety at construction sites. *Id.*, at 869–70; *Accord Ogilvie v. Steele by Steele*, 452 N.E.2d 167, 169–70 (Ind.Ct.App.1983). Prior to the statute, subcontractors were subject to the "pernicious effects of these clauses," whereby general contractors managed to shift the financial risks of liability onto subcontractors. *Id.* This reduced the general contractors' incentive to maintain worker safety, thus increasing the risks of accidents on a construction site. *Id.*, at 870, (quoting *Davis v. Commonwealth Edison Co.*, 61 Ill.2d 494, 336 N.E.2d 881, 884 (1975)); *McMunn*, 791 F.2d at 92. Restricting the use of indemnity provisions in such situations serves to protect workers in the industry as well as the public at large from the dangers associated with construction work. *Id.*

The *Fort Wayne Cablevision* court discussed two factors in determining that a contract to give a license to a cable company to attach cable wires to utility poles was not a construction contract within the meaning of I.C. § 26–2–5–1. First, in view of "the realities of the contract," does "it require[ ] strained usage and interpretation in order to consider it to be a construction contract." *Id.*, 443 N.E.2d at 869. In performing this examination, the court recognized that, although the language of the contract is important, "labels will not control over substance." *Id.* Where the contract is not ambiguous, we should give effect to the plain and ordinary meaning of the language used. *Id.* Second, considering the statute's purpose to prevent the dangerous tendency in the construction industry to shift risks and thereby reduce safety for both workers and the public, is the contract "the kind the legislature intended to regulate by IC 26–2–5–1." *Id.*

Under the first consideration, we do not think it requires "strained usage and interpretation" in order to consider LTV's contract with Northwest to be a construction contract. The contract established an open-ended framework for LTV to use Northwest for such projects and at such times as became necessary. It consisted of a standard purchase order and several attached pages. The purchase order provided that, upon LTV's request and under its direction, Northwest would furnish labor, materials, supervision and equipment for "general maintenance repairs" at LTV's Indiana Harbor Works. The Order also provided that "[t]his

work is to be performed in accordance with the terms and conditions of Owner's Specification G.O. 106–CP–84 dated 10–25–84," which was attached to the purchase order. The Owner's Specification form outlined the rates for providing labor, parts and equipment. It discussed the purchase of "construction materials," and the use or rental of "construction equipment," including cranes, fork lifts, and backhoe loaders. Regardless of the labels used, the contract provided LTV with the authority to direct Northwest to perform heavy construction work, and it gave Northwest the rate information and access to the equipment it might need to complete such work. It should come as no surprise to LTV that it could call upon Northwest to perform heavy construction under the terms of this contract. Roger S. Johnson, president of Northwest, stated in his undisputed affidavit (Johnson Affidavit) that "at all times pertinent hereto, Northwest was a general industrial contractor engaged in the business of performing heavy industrial construction, including primarily structural steel erection (heavy iron work), heavy machinery installation (millwright work) and the installation of pipes, valves and vessels (pipefitting construction)." Moreover, LTV does not dispute that the work which it actually directed Northwest to perform, removing and replacing the heavy steel wearplates in the coal hopper, was "the same construction work which took place when the coal hoppers and their linings were originally constructed." (Johnson Affidavit). Thus, the contract provided LTV the authority to require construction work, it provided Northwest the means to perform such construction work, and Northwest actually performed construction work under the contract. It certainly does not stretch reality to classify this as a construction contract.

The second consideration articulated in *Fort Wayne Cablevision*, that the contract be

the type the legislature intended to regulate when it enacted I.C. § 26–2–5–1, also suggests that LTV's contract with Northwest was a construction contract. According to the contract, all the work was to be performed under the direction of LTV personnel at a site, the Indiana Harbor Works, which was under LTV's complete control. Thus, LTV had the ability to affect workplace safety at the construction site.[1] Since LTV's requirement that Northwest indemnify it against liability arising from LTV's own negligence may have reduced its incentives to "take accident prevention measures and provide safe working conditions," *Fort Wayne Cablevision*, 443 N.E.2d at 871 (quoting *Davis*, 336 N.E.2d at 884), it is the type of clause the Indiana legislature intended to regulate in I.C. § 26–2–5–1. Moreover, due to the character of the work authorized under the contract, LTV needed to be as vigilant in protecting against risks to workplace safety as it would be if it had commissioned the construction of a new coal hopper and linings. According to Johnson, the work authorized under the contract was essentially the same as the work required for the original construction. While neither party was able to substantiate whether the risk to the workers and the public increased or decreased in this kind of project, it is likely that the risk to Ellch and the other members of his crew was substantially the same as the risk to the workers who originally constructed the coal hopper. However, the precise degree of risk is not the critical factor. Whether a contract calls for the construction at the same time as the entire plant is being built, or whether the construction is ordered sometime in the future, should not alter the fundamental nature of the contract. The statute makes no distinction between small construction jobs and huge construction jobs or low-risk construction sites and high-risk

1. We therefore reject LTV's argument that the policy interests of the statute are not implicated because no subcontractor was involved. Not only did LTV have the general responsibilities of a landowner with respect to the conditions of the premises upon which work was to be performed, but the contract contemplated some supervision by LTV. The Purchase Order provided the work would be performed "as directed" by LTV personnel. Furthermore, the 2/19/88 letter from Albert B. Kabella, Vice–President of J. Hilding Johnson to C.E. Hajek, Senior Buyer, Construction & Field Services at LTV, which LTV asserts was made part of the contract, states that Northwest would provide personnel who "are acceptable to your on site supervision."

construction sites;[2] rather, it distinguishes between construction contracts and other types of contracts, and concludes that, on balance, contracts in the construction industry are most in need of protection from the abuses attendant to the risk-shifting in indemnity clauses. According to *Fort Wayne Cablevision*, contracts in the construction industry were singled out because of the "widespread use" of indemnity agreements in the industry and the fact that "[w]ork in the construction industry is often hazardous." *Id.*, 443 N.E.2d at 870 (quoting *Davis*, 336 N.E.2d at 884). Thus, the policy interests surrounding I.C. § 26–2–5–1 suggest that LTV's contract with Northwest should be covered by the statute as a construction contract.

LTV argues that this contract cannot be a construction contract because it did not involve the building of something new. In *Ogilvie*, the Indiana Court of Appeals determined that "[c]onstruction work means to build, erect, or create." *Id.*, 452 N.E.2d at 170. According to LTV, this means that an improvement to something already existing would not be a construction contract under the plain meaning of the statute. We fail to see how such a narrow distinction can be drawn. An old wall can be torn down, and a new one built, erected or created in an already-existing house, yet it is also an improvement to a pre-existing structure. Similarly, the removal of the wearplates lining the coal hopper and their replacement with hardened carbon-steel plates more than four foot square involved the erection or creation of a new lining for the coal hopper. LTV's agreement was certainly broad enough to at least be "collateral to, or affecting" all the activities in *Ogilvie*'s definition of construction work. Ind.Code Ann. § 26–2–5–1 (Burns 1992). Indiana case law, therefore, does not suggest that LTV's contract with Northwest would be excluded from the plain meaning of the statute.[3]

This contract, made with a full-time member of the construction industry, involved a risk that the indemnitee would reduce safety precautions and a worker would be injured. It was the same kind of risk which existed when the coal hopper was originally constructed. Under the realities of the contract, and the intent of the Indiana legislature when it enacted I.C. § 26–2–5–1, LTV's agreement with Northwest is properly classified as a "construction contract."[4] Therefore, the indemnity clause contained within the contract is void as against public policy

**2.** This is not to say that the degree of risk can be fixed based upon the complexity or size of the project or whether it is completed during the original construction or in future years. It is conceivable that a repair job performed after the original construction has been completed, and while a building is in use, may be more dangerous due to the increased number of people on hand who are unfamiliar with basic rules of construction safety, than the same job done during the original construction, where one construction trade may operate in relative isolation, with few distractions and more room to operate.

**3.** In several cases, courts have held that a contract is not a construction contract, even though the contract arguably affected an activity which might be called "construction." However, in all such cases, the contract itself was of an entirely different character than the contract before us. *See, e.g., McMunn*, 791 F.2d at 93 (rental agreement for a bobcat loader where the rental company did not know it would be used in nonhighway construction); *Orville Milk Co. v. Beller*, 486 N.E.2d 555, 557 (Ind.Ct.App.1985) (rental agreement for space heaters which were used in a construction area); *Ogilvie*, 452 N.E.2d at 170 (lease authorizing use of railroad tracks, with "sparse lease provisions that speculate about additional trackage"); *Fort Wayne Cablevision*, 443 N.E.2d at 869 (license to attach cable television lines on utility poles).

**4.** We thus need not examine the statute and other relevant provisions of the Indiana Code in an odyssey to discern whether "maintenance" has a meaning separate and distinct from "construction." The *Fort Wayne Cablevision* factors address whether a contract, regardless of whether it is for maintenance, repair, or construction, is a "construction contract" under I.C. § 26–2–5–1. Applying these factors, we find that LTV's contract with Northwest is a construction contract under Indiana's interpretation of the statute. Even if LTV's contract involved maintenance work as distinguished from construction work, it would not violate any rule of statutory construction to find that a "construction contract" covers a range of activities including maintenance, repair, and construction work. For example, a California statute similar to Indiana's defines "construction contract" to include agreements involving construction, repair, improvement or maintenance. Cal.Civ.Code § 2783 (Deering 1994).

and LTV is not entitled to indemnification from Northwest for Ellch's injury.

### B.

 LTV requests, in the alternative, that we certify the question of whether a "construction contract" under I.C. § 26-2-5-1 includes a contract for maintenance and repair to the Indiana Supreme Court under Circuit Rule 52. This we decline to do. Our analysis principally involved an examination of LTV's contract with Northwest. "[F]act specific, particularized decisions that lack broad, general significance are not suitable for certification to a state's highest court." *Woodbridge Place Apartments v. Washington Square Capital, Inc.*, 965 F.2d 1429, 1434 (7th Cir.1992). Even if the Indiana Supreme Court were to answer LTV's proposed question, it would not be dispositive in this case since the question we answered was whether this particular contract was a construction contract, not whether a contract to perform maintenance and repair work is a construction contract. Furthermore, although the Indiana Supreme Court has yet to issue any controlling precedent on this question, we find sufficient guidance in the decisions of the Indiana Court of Appeals to decide this case without subjecting the parties to the additional delay and expense inherent in certifying a question to the Indiana Supreme Court. *See Katapodis v. Koppers Co.*, 770 F.2d 655, 660 (7th Cir.1985).

### III.

For the reasons above, the decision of the district court is AFFIRMED.