### In re KIDS CREEK PARTNERS, L.P., Debtor.

### Bankruptcy No. 94 B 23947.

United States Bankruptcy Court, N.D. Illinois, Eastern Division.

April 24, 1998.

See Also: 219 B.R. 1020.

Neil Wolf and Janet Baer of Schwartz, Cooper, Greenberger & Krauss, Chicago, IL, for Movant.

David A. Belofsky, Douglas Belofsky, and Steven Shamash, Chicago, IL, for Respondent.

David R. Herzog of Layfer Cohen & Handelsman, Chicago, IL, trustee.

### MEMORANDUM OPINION ON APPLICATION OF LEIGHTON HOLDINGS FOR ALLOWANCE AND PAYMENT OF ADMINISTRATIVE CLAIM

JACK B. SCHMETTERER, Bankruptcy Judge.

This case was filed as a voluntary bankruptcy proceeding in Chapter 7 of the Bankruptcy Code, Title 11 U.S.C. The Chapter 7 Trustee is David Herzog ("Trustee"). Leighton Holdings, Ltd. ("Applicant" or "Leighton") filed its Application for Payment of Super–Priority Claim ("Leighton's Application"), and the Trustee filed his Objection thereto. Leighton requested payment of costs incurred maintaining a letter of credit ("LOC") issued by the First National Bank of Chicago ("Bank") and attorney's fees arising out of its successful defense of an adversary proceeding brought by the Chapter 7 Trustee. No party requested an opportunity to offer evidence. They thereby waived any right to offer evidence, and the parties submitted this issue on the pleadings and record of proceedings herein. This Opinion will stand as Findings of Fact and Conclusions of Law on the issues discussed.

### UNDISPUTED FACTS

The following facts are not in dispute:

Pursuant to agreed order dated and entered December 30, 1994 ("December 30 Order"), Leighton was to post a $1.25 million LOC to secure the Trustee's recovery should the Trustee file and win a suit against Leighton. As consideration for that LOC, it was agreed and ordered that, should Leighton

win the suit, it was to receive a superpriority claim herein against estate assets to enable it to recover reimbursement of its costs involved in obtaining the LOC and attorneys' fees and expenses incurred by it in defending such proceeding.

The Trustee filed his suit here as an Adversary Complaint, and trial was held thereon. At close of plaintiff's case, Leighton moved for judgment on partial findings. From the bench, it was announced that such motion would be granted after preparation of appropriate Findings of Fact and Conclusions of Law. Subsequent to that announcement from the bench of the forthcoming judgment to be entered in Leighton's favor, but prior to entry of Findings of Fact and Conclusions of Law and judgments thereon, Leighton notified the Trustee that it planned to let the LOC lapse. That notification was transmitted to the Trustee before the LOC lapsed. The Trustee attempted to draw down the LOC prior to its lapse, and did so within the time required by the LOC. However, according to the Bank, the Trustee failed to comply properly with procedures required by the LOC. As a result, the Trustee's timely draw was unsuccessful, and the LOC then lapsed by its terms.

Subsequent to entry of judgments against the Trustee in the Adversary case on all counts that were tried, Leighton filed its present application here for payment of its claim as a superpriority ahead of all other administrative creditors. The Trustee objected to Leighton's claim as a superpriority, arguing that the Bankruptcy Code does not authorize the superpriority to which he had agreed in the December 30 Order, that Leighton breached terms of the agreed Order, that Leighton's fees were unreasonable, that the application reflects activities for defending a co-defendant, Cecil McNab ("McNab"), and that Leighton's counsel had a conflict of interest and as such is not entitled to any compensation. Leighton also requests disgorgement of all interim fees paid to the Trustee and Special Counsel.

### The December 30 Order

Leighton claims entitlement to reimbursement of its costs, fees, and expenses concerning the LOC and its successful defense of an adversary proceeding as a superpriority administrative claim pursuant to the December 30 Order. In order to bring some cash into the estate when that Order was entered in 1994, the Trustee needed to sell a portion of a parcel of real estate which was property of the estate. However, he could not sell the property without securing a release of Leighton's mortgage on the entire parcel of real estate. If he was to pay most of the sale proceeds to pay off the Leighton mortgage, how could he collect on a judgment since Leighton's assets are offshore? The LOC was his answer to that dilemma. The background of the consequent December 30 Order was summarized in a District Court opinion on Leighton's appeal from an order allowing interim fees to the Trustee's Special Counsel:

> In order to secure a release of Leighton's leasehold mortgage, the Trustee had to pay off in full Debtor's obligations to Leighton. However, there was a further complication—the Trustee did not want to pay Leighton. The Trustee suspected that the Estate may have a cause of action against Leighton to invalidate Leighton's security interest and leasehold mortgage. Apparently the Trustee was concerned that, if he paid Leighton its debt, Leighton might move the funds off-shore beyond the jurisdiction of the Trustee and the Bankruptcy Court. Hence, as noted by the Bankruptcy Court, the Trustee was "in a box" from which he could escape only by making a deal with Leighton. The Trustee thus entered an agreement with Leighton, the terms of which were included in an Agreed Order entered by the Bankruptcy Court on December 30, 1994.

> The Agreed Order authorized the Trustee to exercise Debtor's option to acquire the Munson Parcel from GTCRC and to sell that parcel to Munson free and clear of any liens or encumbrances. In exchange, the Agreed Order provided that Debtor's Estate would pay Leighton the full amount of its secured claim. To provide adequate assurance and protection to the Trustee and Leighton regarding the anticipated litigation between them, several additional

provisions were also included. First, Leighton was required to furnish a $1,250,-000.00 letter of credit from which the Trustee would be repaid if he prevailed in the Estate's lawsuit against Leighton. The Trustee was given a time period of 45 days in which to commence the litigation against Leighton, with the failure to timely initiate proceedings to be construed as a waiver of all claims. Second, the Agreed Order provided that, if Leighton were to prevail in the lawsuit, Leighton would be allowed a superpriority administrative claim for all costs, fees and expenses associated with (1) the issuance of the letter of credit, (2) the defense of the Trustee's lawsuit, and (3) the collection of Leighton's claim. The agreement was that Leighton's claim would be prior to any others asserted under § 507(a) of the Bankruptcy Code.

In compliance with the Agreed Order, the Trustee sold the Debtor's interests in the Commons property for approximately $2,800,000. On January 18, 1995, the Trustee then paid Leighton $2,098,496.41 out of the proceeds to satisfy "all obligations to Leighton Holdings, Ltd. through January 3, 1995." Leighton provided an appropriate letter of credit and permitted recording of its Discharge of Mortgage and Security Interests previously dated November 30, 1994.

*In re Kids Creek Partners, L.P.*, 1997 WL 627652, *2–3 (N.D.Ill. October 2, 1997), *appeal dismissed*, (7th Cir. December 30, 1997). *See also*, March 7, 1996, Tr. at 6.

The Order itself provided in pertinent part:

> If the Trustee initiates such a lawsuit and the SC [1] prevails, then the SC shall have an allowed super-priority administrative claim, prior to the claim of any holder of a claim otherwise allowable under Section 507(a) of the Bankruptcy Code, for (a) all costs and fees associated with the issuance of the letter of credit; (b) all legal fees and expenses incurred in defense of the lawsuit; (c) all other fees and expenses rea-

sonably incurred in connection with the collection of SC's claim; and (d) any and all funds previously drawn by the Trustee under the letter of credit, together with interest at the SC's contractual, default rate.

The December 30 Order was the result of a full-day hearing which included several recesses and negotiating sessions. March 7, 1996, Tr. at 5. The net result was that the sale was held and from its net proceeds (after obtaining release of Leighton's mortgage from the property sold) the Trustee held a war chest with which he hoped to pay administrative expenses of the estate, most notably anticipated expenses of litigation with Leighton that might be due to Trustee's counsel to be employed in suing Leighton.

### The Litigation

On February 15, 1995, within the forty-five-day period contemplated by the December 30 Order, the Trustee filed a seven-count Adversary proceeding against Leighton Holdings, McNab, Raphael Rios and Robin Schabes seeking equitable subordination of Leighton's claim, recharacterization of Leighton's claim as equity, breach of contract, breach of fiduciary duty, and inducement to breach fiduciary duty. On August 21, 1995, the Trustee was granted leave to employ David Belofsky & Associates ("Special Counsel") as counsel for the purpose of representing the Trustee in the Adversary Proceeding. Leighton was represented by Schwartz, Cooper, Greenberger, and Krauss ("Schwartz Cooper"). Trial was held on five counts of the Adversary.[2]

At close of plaintiff's case after 16 days of trial testimony, defendants moved for judgment on partial findings pursuant to Fed. R.Civ.P. 52(c) (applicable pursuant to Fed. R. Bankr.P. 7052). Defendant's motion was granted as the Trustee had failed to offer sufficient evidence to prove all required elements of any of the counts on trial. *See In re Kids Creek Partners, L.P.*, 212 B.R. 898

---

**1.** "SC" refers to Leighton.

**2.** Count VI against Schabes was dismissed pursuant to agreed order on March 8, 1996, and Count V against Rios was dismissed pursuant to order on January 2, 1998.

(Bankr.N.D.Ill.1997), for the resulting Findings of Fact and Conclusions of Law.

The evidence told a story about how the state of Michigan for nominal consideration turned over valuable state property near Traverse City to parties who were to develop the site. Some financing was obtained and efforts made to sell and develop the property. The price offered was lower than hoped for, too low to meet both financial requirements of the project and also enable payment of a threatened capital gains tax. To avoid that tax, the Debtor's part in the project was aborted, its dissolution announced, and the Debtor placed in bankruptcy. The Chapter 7 Trustee completed the sale and paid off the lender's mortgage from sale proceeds. Plaintiff complains that the project was doomed by the refusal of Leighton as lender to fund the last advance involved in a series of loans. But the evidence showed that the project failed due to mismanagement, breach of contractual obligations owed by Debtor to the lender, a lower offered sale price than was hoped for, and the capital gains tax problem, among other reasons not caused by Defendants. If the final loan advance had been extended, the project still would have failed, and there were ample contractual grounds to deny the final funding. In the end, a most valuable site obtained for nominal consideration and having great potential for different uses and community enhancement was financed to a significant stage, planned, disputed over, bargained for, and maneuvered over by people who laid the groundwork for development, but at last, when Debtor's part in the Project ended, the whole effort had built ... nothing at all.

*Kids Creek,* 212 B.R. at 904. Findings of fact and conclusions of law were entered on September 23, 1997, followed by judgment orders entered October 1, 1997, in favor of defendants on Counts I, II, III, IV, and VII on October 1, 1997. The Trustee has appealed from entry of the judgments against him, and that appeal now pends in District Court. He neither sought nor received any order of supersedeas before this Court or the District Court.

### Leighton's Application for Superpriority Claim

Leighton filed its redacted Application for allowance and payment of its super-priority administrative claim and filed a non-redacted version of the same Application under seal. The Application seeks recovery of Leighton's fees and costs totaling $1,657,802.31 asserted to result from obtaining the LOC and fighting the litigation. Since the Trustee holds much less than that in the estate, the Application further requests that $87,450.94 previously paid to the Trustee and Trustee's counsel out of estate funds be disgorged and paid to Leighton in partial satisfaction of Leighton's claim. Application at 17–18.

Further undisputed facts are set forth in the Discussion below.

### Jurisdiction

This matter properly lies here pursuant to 28 U.S.C. § 157 and Local General Rule 2.33(A) of the Northern District of Illinois. Subject matter jurisdiction arises under 28 U.S.C. § 1334(b). Venue is proper under 28 U.S.C. § 1409. This matter constitutes a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (B).

### DISCUSSION

The Trustee has raised a number of objections to the Leighton Application, each without merit.

■ One preliminary point should be made. The December 30 Order required Leighton to "prevail" in the Adversary in order to recover its superpriority administrative claim. *See supra,* p. 967. Special Counsel does not dispute that Leighton has prevailed. "As a term of art, a party who has been victorious on a claim in the trial court is a 'prevailing party' for the purposes of the application of fee shifting statutes and the like...." Special Counsel's Surreply at 12. Leighton has prevailed in the Adversary.

### Superpriority and the Bankruptcy Code

■ The Trustee first argues that superpriority granted to Leighton in the De-

cember 30 Order is unauthorized by the Bankruptcy Code. However, "the bankruptcy court has the ability to deviate from the rules of priority and distribution set forth in the code in the interest of justice and equity." *In re Saybrook Mfg. Co.*, 963 F.2d 1490, 1495 (11th Cir.1992) (citation omitted).

Moreover, a superpriority may be awarded where adequate protection fails. *Matter of Plunkett*, 191 B.R. 768, 780 (Bankr. E.D.Wis.1995). Adequate protection may come in a number of forms, including a seemingly sufficient equity cushion. *Baybank–Middlesex v. Ralar Distributors, Inc.*, 69 F.3d 1200, 1203 (1st Cir.1995). Thus, a superpriority may be awarded where an equity cushion erodes to the point where the creditors' claim is jeopardized.

Under the Bankruptcy Code,

> If the trustee, under section 362, 363, or 364 of this title, provides adequate protection of the interest of a holder of a claim by a lien on property of the debtor and if, notwithstanding such protection, such creditor has a claim allowable under subsection (a)(1) of this section arising from the stay of action against such property under section 362 of this title, from the use, sale, or lease of such property under section 363 of this title, or from the granting of a lien under section 364(d) of this title, then such creditor's claim under such subsection shall have priority over every other claim allowable under such subsection.

11 U.S.C. § 507(b).

In *Plunkett*, the opinion parsed out the meaning of § 507(b):

> Section 507(b) provides that if adequate protection payments are given to a creditor whose claim is secured by a lien on property of the debtor and such adequate protection fails, the creditor has a priority claim over all other priorities listed in section 507. To qualify for this superpriority, § 507(b) states that the creditor must have a claim allowable under section 507(a)(1). Section 507(a)(1) in turn gives a priority to administrative expenses allowed under section 503(b). Turning to the text of 503(b), the only applicable subsection is

503(b)(1)(A), which allows administrative expense priorities for "actual, necessary costs and expenses of preserving the estate...." The question then becomes whether or not the "cost" or "expense" incurred by Emerald by not foreclosing on the property was actual and necessary to preserve the estate.

> ... To be an "actual and necessary" cost of preserving the estate, an expenditure must benefit the estate as a whole. *Fruehauf Corp. v. Jartran, Inc. (In re Jartran, Inc.)*, 886 F.2d 859, 871 (7th Cir.1989). In other words, there must be some net benefit to the estate or a preservation of the status quo after the costs to the creditor and the benefits to the estate are taken into account.

Here, in agreeing to the sale sought by the Trustee, Leighton gave up its position as an over-secured creditor. To cover its claim for litigation expenses that could have been added to its lien against the real estate, and in return for giving up its security rights, it took the superpriority claim as a new form of adequate protection. In doing so, it paid a cost—i.e., loss of its security—that (in the words of *Plunkett*) was "actual and necessary" to preserve the estate's equity in the property then sought to be realized by the sale. Obtaining that equity in cash—which the Trustee wanted as a war chest to sue Leighton and thereby obtain still more for the creditors—was a net benefit to the estate. Therefore, the substitute superpriority protection afforded to Leighton is by no means outside this Court's authority under § 507(b).

It is true that "[c]reditors within a given class are to be treated equally and bankruptcy courts may not create their own rules of superpriority within a single class." *Id.* at 1496. However, notice was given to creditors of the proceedings at which the December 30 Order was entered. Longer notice was impossible, as the Trustee then argued, because the sale was to close a day or two later or not at all.

The only objection came from VOA Associates, a creditor of Debtor. That objection was overruled. Moreover, no appeal was taken from the December 30 Order or the

order overruling VOA's objection. The December 30 Order was not only an agreed order, but it was a final order. "Orders approving or failing to approve the sale of a debtor's property are considered final decisions and are immediately appealable." *In re Sax*, 796 F.2d 994, 996 (7th Cir.1986). Finally, the present issue affects only administrative creditors since the estate is administratively insolvent, and by far the largest creditor is the litigation counsel who represented the Trustee in the failed litigation.

### Trustee Cannot "Mend the Hold"

Even if the superpriority at issue here were not authorized by the Bankruptcy Code, the Trustee cannot argue its invalidity at this time. Roughly three years have passed since the Trustee, Trustee's then counsel, and counsel for Leighton negotiated and submitted the December 30 Order for Court approval. The Trustee now argues that "Leighton is not entitled to 'superpriority' status because the Bankruptcy Code provides no authority for Leighton to acquire such status." However, it is too late at this juncture in the litigation for the Trustee to argue that the agreed order of December 30, 1994 was invalid. Because the December 30 Order was an agreed order, it was in the nature of a contract and general principals of contract law may apply. *See Martin v. Davies*, 917 F.2d 336, 339 (7th Cir.1990), *cert. denied*, 501 U.S. 1208, 111 S.Ct. 2805, 115 L.Ed.2d 978 (1991). Pursuant to the "mend the hold" doctrine, the Trustee, as a party to the agreed order, cannot take inconsistent positions in litigation over the order. *C.L. Maddox, Inc. v. Coalfield Services, Inc.*, 51 F.3d 76, 79 (7th Cir.1995) (citing *Harbor Ins. Co. v. Continental Bank Corp.*, 922 F.2d 357, 362–65 (7th Cir.1990), *reh'g denied* (Jan. 29, 1991)). The "mend the hold" doctrine extends to situations where a position taken in prior dealings with a party to a contract is inconsistent with the position taken later during litigation. *See Raffel v. Medallion Kitchens of Minnesota, Inc.*, 1996 WL 675787 (N.D.Ill.1996), *aff'd on other grounds*, 139 F.3d 1142 (7th Cir.1998) (citing *Harbor Ins. Co.*, 922 F.2d 357).

The Trustee is certainly taking an inconsistent position now. Since 1994, the Trustee has required Leighton to renew and maintain the LOC. As late as September of 1997, the Trustee argued that Leighton had to renew the LOC pursuant to the terms of the December 30 Order. Moreover, at no previous time, during any hearing on the validity of the order, did the Trustee ever argue that he may have been without authority to enter into the Order.

On March 7, 1996, a hearing was held on motion of creditor VOA Associates ("VOA Hearing") to set aside that portion of the December 30 Order granting Leighton a contingent superpriority. While the Trustee may not have filed any pleadings in response to the motion, he was represented by two attorneys at the hearing held on VOA's motion, one of whom was Trustee's Special Counsel Steven Shamash ("Shamash"). At no time during that hearing did the Trustee or his counsel voice any objections to the validity of the December 30 Order or of any portion of that Order. Findings of Fact and Conclusions of Law were entered after hearing on the VOA motion, and at that time it was determined that the December 30 Order was proper. March 7, 1997 Tr. at 14. At that time, it was also expressly found that Leighton had an authorized superpriority under the Bankruptcy Code:

> [T]he Bankruptcy Code creates two types of superpriority claims ... The first being when a secured creditor seeks adequate protection in connection with an automatic stay, or the use of collateral, or the funding of the bankruptcy estate ... and is granted then some superpriority by the court ... In this particular case, the collateral of Leighton was used. In fact, when they lost ... the collateral on the 400 acres, they gave that up in order to close the deal, but in return only for a superpriority. They also ... agreed to give a letter of credit so the trustee can get money back if he ever wins that lawsuit ... That is a superpriority which is authorized under the Bankruptcy Code.

March 7, 1997, Tr. at 15–16. No appeal was taken from the order denying the VOA motion.

Indeed, there has been considerable litigation before this Court and before a district

court judge on appeal concerning Leighton's superpriority and whether it affected Trustee's Special Counsel's ability to receive their awarded interim fees. But at no time before now did the Trustee or his Special Counsel argue that the Order granting a future superpriority conditioned on victory by Leighton was in any way invalid. Rather, the position of the Trustee and his Special Counsel argued here and before a district judge was that Leighton would not be entitled to its superpriority until it prevailed in the Adversary. Special Counsel received awards of interim attorney's fees before Leighton won the litigation. Because Leighton apprehended that allowance of interim fees eroded estate funds against which its superpriority claim might later lie, Leighton appealed. The district court affirmed the interim fee allowance subsequent to announcement of a ruling from the bench following trial of the Adversary case, but prior to final judgment in the Adversary being entered. In doing so, District Judge Kocoras opined that:

> Leighton's superpriority claim, if it in fact becomes vested and assertable, should have priority over any other administrative claims arising under § 507 of the Bankruptcy Code, including those asserted by the Special Counsel ... [Leighton's] claim is expressly contingent upon Leighton prevailing in the Adversary Proceeding below, a contingency which has not yet been resolved.

*Kids Creek Partners,* 1997 WL 627652, *6.

As late as August 20, 1997, Special Counsel conceded that Leighton would be entitled to an allowed superpriority claim upon entry of judgment against the Trustee. August 20, 1997, Tr. at 6. Even on September 19, 1997, Special Counsel still considered the December 30 Order to be valid. *See* Belofsky's Response to Leighton's Objection to Belofsky's attorney's fees.

Judicial estoppel applies to prevent "intentional self-contradiction" from "being used as a means of obtaining unfair advantage." *Medcom Holding Co. v. Baxter Travenol Laboratories, Inc.,* 106 F.3d 1388, 1396 (7th Cir.1997). The Trustee waited until he was no longer able to benefit from the December 30 Order before contesting the superpriority

provision. When he lost the trial on a motion for judgment on partial findings, and after he failed to draw on the LOC in a way that satisfied the Bank, both the LOC and its proceeds were lost. The Trustee then did not seek a supersedeas, but instead returned to the same court in which he agreed to the December 30 Order to contend that the Order was improper.

Leighton and the Trustee operated for three years under what everyone took to be a valid order. Only after the Trustee was unable to benefit from the Order any further did he challenge it. His inconsistent position in this litigation comes far too late.

### Equitable Estoppel

 Moreover, under the doctrine of equitable estoppel, the Trustee cannot now argue that this order is invalid. Equitable estoppel "aids a party who, in good faith, has relied to his detriment, upon the representations of another." *In re Vick,* 75 B.R. 248, 249 (Bankr.E.D.Va.1987). There are three elements to equitable estoppel: (1) The party to be estopped made a representation, (2) a second party relied on that representation, and (3) the second party changed position based upon that representation. *Id. See also Federal Deposit Ins. Corp. v. Rayman,* 117 F.3d 994, 1000 (7th Cir.1997). First, the Trustee represented that he had the authority to give Leighton a superpriority for attorneys fees and costs surrounding the LOC should Leighton prevail in the adversary. Second, Leighton relied in Trustee's representation. Third, Leighton changed position by releasing its liens on the entire parcel of land and permitting the sale to go forward, by opening and maintaining a letter of credit, and by vigorously defending the adversary proceeding against it. "Estoppel focuses not on the intent of the party, but on the effects of his conduct upon the other party, for even if he has not waived a known right, he may be estopped from enforcing it." *Vick,* 75 B.R. at 249; *see also Saverslak v. Davis–Cleaver Produce Co.,* 606 F.2d 208, 213 (7th Cir.1979), *cert. denied,* 444 U.S. 1078, 100 S.Ct. 1029, 62 L.Ed.2d 762 (1980). Thus, the Trustee is estopped from arguing that the December 30 Order is invalid.

Leighton relied on the Trustee's agreement. It is undisputed that had Leighton not agreed to release its lien on the remaining acreage, the December 30, 1994, sale of assets would not have gone through. The Trustee needed Leighton to lift its lien from the entire property, but Trustee did not want to pay Leighton its secured claim without some assurance he would be able to recover the money should he succeed in an equitable subordination action. Thus, Leighton and the Trustee negotiated in good faith for sources to insure payment of Leighton's expenses and fees if it prevailed. They negotiated that, in exchange for posting of the LOC, Leighton would be compensated in the event it prevailed in the adversary proceeding.

When the Trustee believed he would prevail in the Adversary case and wanted the LOC to remain in effect, he fully supported the December 30 Order's validity. When the tide turned and Leighton sought to collect its due, the Trustee changed his position. Only when he unsuccessfully attempted to draw on the LOC and it lapsed did he argue that part of the quid pro quo offered by him in exchange for Leighton's agreement to the Order was invalid. He is too late with this argument.

### It Has Not Been Established
### that Leighton Breached
### the Agreement

■ The Trustee also argues that Leighton is not entitled to receive its superpriority claim because it breached terms of the December 30 Order by letting the LOC lapse between the announcement of the judgment and the entry of the judgment order. The December 30 Order stated:

> If the Trustee files a lawsuit against SC within such 45–day period, the letter of credit *will* be extended or renewed as necessary to secure the Trustee's asserted claim until such claim is resolved *(or, if the letter of credit is not so extended or renewed then the Trustee may draw on the letter of credit, retain the proceeds of such drawing in escrow, and apply the proceeds as determined by such lawsuit or an agreement of the parties)*. In the latter event, SC shall have a first priority lien

against such letter of credit proceeds in the amount ultimately determined to be appropriate.

December 30 Order (emphasis added). The plain language of the Order indicated that Leighton had an option to maintain the LOC or to let the Trustee draw on it. Special Counsel and the Trustee, however, now argue that the ability of the Trustee to draw on the LOC was merely a remedy for breach of the agreement and not an alternative to maintaining the LOC. Leighton, argues the Trustee, was required to maintain the LOC until the adversary was "resolved" which the Trustee seems to believe is when the Supreme Court of the United States either denies certiorari or grants certiorari and rules in the Trustee's favor. Special Counsel cites several cases asserted to interpret the term "resolve" to mean when all avenues of appeal are resolved. Special Counsel's Surreply in Further Opposition to Leighton's Application. However, neither the Trustee nor Special Counsel give support for the proposition that Leighton did not have an option to let the Trustee draw down the LOC rather than maintain it.

The Trustee points out that the Order provided that the LOC "*will* be extended or renewed," as apposed to "*may* be extended...." (Emphasis added.) He reasons that Leighton therefore had a mandatory obligation to maintain the LOC until resolution of the Adversary. It is true that "will" is defined as having the mandatory sense of "shall" or "must." Blacks Law Dictionary, p. 1598 (6th ed.1990). *See also In re Doty,* 129 B.R. 571, 597 (Bankr.N.D.Ind.1991). However, the phrase "will be extended or renewed" is modified in the Order by the clause "as necessary." If the Trustee had drawn on the LOC, he would have held cash and renewal would have neither been "necessary" nor served any purpose protective of the Trustee.

In addition, the same sentence under discussion also contains the parenthetical "... or, if the letter of credit is not so extended or renewed then the Trustee may draw on the letter of credit, retain the proceeds of such drawing in escrow, and apply the proceeds as determined by such lawsuit or an agreement of the parties." The mere fact that this

phrase is contained within parentheses does not alter its meaning. That language of the Order clearly gave Leighton the option to maintain the LOC or to allow the Trustee to draw it down and hold the cash as security.

Further, the paragraph ends with the phrase, "In the latter event [if the Trustee draws down the LOC], SC [3] shall have a first priority lien against such letter of credit proceeds in the amount ultimately determined to be appropriate."

■ Taking the Order paragraph under discussion as a whole, it is clear that intent of the parties and the Court was to provide an alternative to renewal of the LOC. It is important to note that the December 30 Order was not drafted after weeks of debate, but was drafted quickly and on an emergency basis. On the record it was represented that the Trustee that day had only one day left to close the sale before losing the entire deal. No testimony or other evidence was offered to show the intent of the parties, but the Order language is clear, and no such evidence is needed or would be relevant. Rules of "grammatical construction" should not be used to confuse what is otherwise apparent. "Courts will not resort to grammatical niceties or the technicalities of punctuation in the interpretation and construction of an instrument, unless they may be utilized to make plain that which is otherwise obscure." *Hughes v. Samedan Oil Corp.*, 166 F.2d 871, 873 (10th Cir.1948) (citations omitted). *See also Ewing's Lessee v. Burnet*, 11 Pet. 41, 36 U.S. 41, 54, 9 L.Ed. 624 (1837); *Marathon Oil Co. v. Kleppe*, 556 F.2d 982, 985 (10th Cir.1977).

There is no indication in language of the agreed Order that the Trustee's ability to draw on the LOC was limited to situations where there was a breach of the agreement. Rather, it is clear that the Trustee's right to draw on the LOC was an alternate method of compliance with the December 30 Order. In this context, the issue of whether the Adversary litigation was "resolved" by Judgment entered in this Court is irrelevant. Had the Trustee properly drawn on the LOC, he

would be in possession of the proceeds, and could remain in possession of the proceeds until "resolution" of the Adversary, while Leighton's superpriority claim would lie against those proceeds. It is not the function of this proceeding to determine whether the Trustee's draw was sufficient or not. However, it cannot be said on this record that Leighton breached the December 30 Order by not renewing the LOC.

The Trustee and his Special Counsel have another argument in support of their "breach" assertion. They imply that Trustee's failure to properly make his draw on the LOC can somehow be attributed to Leighton. However, the Trustee has not offered evidence showing that Leighton in any way interfered with the Trustee's draw. Terms of the LOC required that the Trustee submit a sight draft drawn on First National Bank of Chicago, accompanied by a "written statement dated no earlier than three days before the expiration of the letter of credit." Letter of Credit, January 13, 1998 Stipulation, ex. 2. The written statement was to represent that proper notice had been given to Leighton.

When the Trustee initiated the Adversary proceeding in February of 1995, Andrew Connor, then with the law firm Winston and Strawn, accepted service of process for both Leighton and Cecil McNab. Attorney Janet Baer,[4] then also with the law firm of Winston and Strawn, entered an appearance as counsel for both Leighton and McNab. Generally, all communications from Leighton to the Trustee regarding the LOC were made through Connor. On August 21, 1997, the Trustee sent a letter to Connor by facsimile requesting that the LOC be extended. On September 2, 1997, Neal Wolf sent a letter to the Trustee also by facsimile stating that Leighton would not renew the LOC. The Trustee faxed a reply to Neal Wolf on September 2, 1997, stating that if the LOC was not renewed, the Trustee would draw down the LOC. On September 4, 1997, The Trustee attempted to draw down the LOC. The Trustee presented the First National Bank of Chicago with a sight draft on September 4,

---

**3.** "SC" in the Order was Leighton.

**4.** Both Baer and Connor are now with the Chicago law firm Schwartz Cooper Greenberger & Krauss Chartered.

1997, and also presented the Bank with a certification letter. The certification letter stated that Leighton had been notified about the draw. However, the Trustee actually sent the notification to Connor at his law firm rather than to McNab in California as the Bank asserted was required by the LOC. As a result, the Bank refused to honor the draw, and on September 5, 1997, the LOC expired by its terms.

Trustee's Special Counsel now argues that Leighton breached the agreement and interfered with its attempts to draw down the funds because the Bank of Bermuda (which backed the Chicago Bank's LOC) refused consent to honor the draw in light of asserted discrepancies between the attempted draw and required procedures. As stated, the issuing Bank claimed that the Trustee did not comply with one express requirement for drawing down the LOC. The Trustee claims that the First National Bank of Chicago was willing to honor the draw if the Bank of Bermuda would waive the discrepancy, but the Bank of Bermuda (assertedly at Leighton's insistence) would not waive the discrepancy, so the draw was not honored. None of that was established by proof. But even assuming arguendo that those assertions were established, it could not be said that such facts would demonstrate that either Leighton or the Bank of Bermuda acted in bad faith merely because the First National Bank of Chicago refused to honor the draw. "Firms that have negotiated contracts are entitled to enforce them to the letter, even to the great discomfort of their trading partners, without being mulcted for lack of good faith." *Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting,* 908 F.2d 1351, 1357 (7th Cir.1990). Leighton is not shown to have performed any acts that thwarted the Trustee's attempts to draw down the LOC. Rather, if indeed the draw was deficient, that was because the Trustee failed to follow instructions of the LOC. Leighton is not to be blamed for mistakes of the Trustee, if indeed the draw was defective.

The Trustee further points out that in February of 1997 Leighton let the LOC lapse and then renewed it. He argues that, because Leighton did not then strictly comply

with the terms of the agreed Order, therefore neither should the Trustee have to do so. However, if the Trustee felt in jeopardy and wished to assert breach because Leighton failed to renew promptly at that time, he could have attempted in February 1997 to terminate the agreed Order or to draw on the LOC before it expired. He chose not to do either. He has offered no evidence now to show that Leighton's failure to renew on time in February 1997 was anything but a mistake that the Trustee and his counsel then found cured and harmless. Indeed, the Trustee does not demonstrate that he suffered any harm at all from Leighton's late renewal of the LOC in February 1997, and he acted at the time as if renewal of the LOC solved the problem to his satisfaction. Since he was satisfied then, now is not the time to make a mountain out of a molehill.

The Trustee also argues that, by Leighton not notifying him of its intent not to renew the LOC until September 2, 1997, it failed to give him adequate time to draw upon the LOC. January 13, 1998 Tr. at 22. However, Douglas Belofsky, one of Trustee's Special Counsel has acknowledged that either Special Counsel or the Trustee knew that Leighton was going to let the LOC lapse a week to ten days prior to its expiration. Dec. 18, 1997, Tr. at 25. (The Trustee was also present in court when that was admitted, and he did not challenge his counsel's statements that one or both of them were aware of Leighton's decision prior to September 2, 1997). Moreover, this timing issue is irrelevant as the LOC provided that the Trustee could not draw down the LOC prior to three days before its expiration. Thus, the earliest he could have drawn on the LOC was September 2, 1997, the very day he received written notice of intent not to renew. He attempted to draw on the LOC two days later, in time but apparently not precisely in the form required.

### Leighton Did Not Interfere with the Trustee's Use of Assets

 Trustee further argues that, because Leighton objected to Trustee's Special Counsel's first interim application for attorneys fees, it should not receive its superpriority, that such objection constituted some sort of

improper interference. However, Leighton's objection can hardly be considered "interference." Leighton made a reasonable argument that it had a future contingent priority interest in the estate funds and that Special Counsel should not receive fees until resolution of the Adversary. Originally, the court found in Leighton's favor. Only after the Trustee presented a persuasive argument on reconsideration was it determined that Leighton was not then secured by remaining assets in the estate and should not yet have the benefit of a superpriority position. Leighton's attempt to delay payment to Trustee's counsel in an effort to preserve its future potential security was reasonable litigation strategy, not an improper interference. Moreover, its opposition failed, and interim fees were allowed, thus allowing continued funding of the litigation.

Trustee also argues that Leighton interfered with its ability to retain expert witnesses. However, the Trustee's Counsel was not permitted to use expert witnesses at trial because they did not comply with express terms of the pretrial order. That order required each party to disclose pretrial expert witnesses and reports that their testimony was to be based upon. Trustee's counsel did not do this. As a result, they were not permitted to use any experts during their case in chief. Their failure to comply with the express terms of the pretrial order was not Leighton's fault or responsibility. Moreover, Leighton's objection to the Trustee expending estate assets to retain potential rebuttal experts did not amount to bad faith interference, and expenditure of such funds was permitted for that purpose over Leighton's objection.

It has not been shown that Leighton or its counsel acted in any way other than in good faith in making the argument against funding possible rebuttal experts. Parties are not to be penalized because their counsel makes legal arguments to advance interests of their clients. *Thompson v. Duke,* 940 F.2d 192, 195–96 (7th Cir.1991). There is no evidence that Leighton unreasonably or improperly "interfered" with the Trustee's ability to use estate assets before he lost the litigation, and thus no reason Leighton should be penalized

by losing benefits of its negotiated agreed Order.

### Leighton's Counsel Had No Conflict

Special Counsel argues that Leighton's counsel should not be allowed to profit by its representation of interests adverse to Debtor, its former client. The undisputed facts are that in late December 1993, Debtor asked Leighton's counsel, Andrew Connor, to represent it in a proposed sale of Debtor's interest in certain real estate. Connor informed Debtor's principals that a waiver of potential conflict would be needed. On December 27, 1994, Connor sent a letter to both McNab, agent for Leighton, and Carl Groesbeck, president of Debtor's general partner, seeking consent to his representation of Debtor. Debtor signed the consent form. The consent form specifically stated that Leighton retained the right to use its attorneys should any litigation arise between Debtor and Leighton.

Connor subsequently stated in his May 1995 affidavit that neither he nor his law firm represented Debtor in connection with the proposed real estate sale. The evidence at trial was that December 22, 1993, through December 24, 1993, Helen Shapiro, a Winston & Strawn attorney working under Connor's direction, collaborated with Rios to draft a possible real estate contract for the contemplated sale. Approximately one week after Shapiro collaborated on the draft real estate contract, Connor sent Debtor a requested waiver of potential conflict to be signed, and Debtor consented to it. Debtor also retained separate counsel in connection with the proposed real estate sale.

Special Counsel now argues that Connor and his firm were aware of confidential matters concerning the Debtor and knew they would soon seek to declare a default as to dealings then between the parties, and therefore Debtor's consent was uninformed. Trustee has offered no evidence to show that Leighton's counsel was aware of any confidential matters or contemplated a default at the time Debtor agreed to the dual representation. Moreover, by the same document in which Debtor consented to dual representation in writing subsequent to Shapiro's work, Debtor also consented to Winston & Strawn

representing Leighton in all future matters and representing Debtor in the proposed sale.

■ The Adversary in which Winston & Strawn represented Leighton was filed in February of 1995, and lawyers of their firm appeared for Leighton shortly thereafter. There ensued two and one-half years of hard-fought litigation. At no point, until Leighton asserted its right to fees of its counsel, did the Trustee raise any assertion of conflict by such counsel. Failure to timely raise such a conflict of interest issue constitutes a waiver of such issue. *Weeks v. Samsung Heavy Indus. Co., Ltd.,* 909 F.Supp. 582, 584 (N.D.Ill.1996) (citing *Kafka v. Truck Insurance Exchange,* 19 F.3d 383, 386 (7th Cir. 1994)).

### Leighton Did Not Unreasonably Expand the Litigation

■ The Trustee makes several additional arguments as to why Leighton should not be compensated for its attorney's fees. He first argues that Leighton's fees were unreasonable in light of Leighton's alleged "total potential exposure" of $1.25 million compared to its request for over $1.6 million in fees and expenses.

Although the Trustee argues that Leighton's total exposure was limited to the amount of the LOC, that argument is not supported by the pleadings. Leighton was being sued, not only for equitable subordination of its secured claim, but also for damages for lost profits alleged to be $8 million. Thus, an unfavorable judgment against Leighton could have greatly exceeded the amount of the LOC. At no point before he lost the case did the Trustee limit his request for damages, and Leighton was reasonably entitled to defend against a potential loss that greatly exceeded limits of the LOC.

It is also suggested that the Trustee would have been unable to collect upon a judgment against Leighton in excess of the LOC. While Leighton is an offshore company and collection would have had its problems, the Trustee cannot be heard to argue that he brought a suit that he felt would result in an uncollectible judgment. He can hardly blame defendant for defending against an $8 million threat by now asserting after defeat that the part of his claim over $1.25 million was meaningless.

■ Finally, Special Counsel argues that Leighton should have proposed some sort of settlement and, because it failed to do so, the large fees in defending the Adversary case should not be compensated. Trustee's Response at 11. However, Leighton had no legal obligation to settle an Adversary case in which the Trustee was unable to make prima facie case as to a single count on trial. The Trustee lost on a Rule 52(c) motion at the close of his case. He failed, after more than two years of discovery, to produce evidence to prove any count of his Adversary Complaint. He is now literally seeking to penalize Leighton for his own failure to recognize that he held a losing hand, thus forcing Leighton to defeat him at trial. Authority does not support that argument.

### Lack of Special Counsel's Consent to the December 30 Order Irrelevant

■ Special Counsel also argues that their employment was not conditioned on any supervening or superior claim or right of Leighton. However, the December 30 Order was a matter of record at the time Special Counsel was appointed. If Special Counsel had misgivings about working for a bankruptcy estate burdened with a contingent superpriority, they should have faced that at the time. An order of record five or six months prior to their retention conferred adequate notice of Leighton's superpriority claim petition and counsel cannot challenge it in this way. The December 30 Order was in place when Special Counsel were appointed. They did not have to accept the appointment. Collection of their fees was from the start potentially conditioned in some part on their victory. They have no right to rewrite their bargain at the expense of Leighton's claim that is now superior to theirs.

### Does the Application Seek Compensation for Defending McNab As Well As Leighton?

Trustee further argues that Leighton's application for reimbursement is unreasonable

in that it seeks compensation for defending both McNab and Leighton. The December 30 Order did not provide reimbursement or protection for McNab's attorney's fees. However, the Trustee did not designate items of work asserted to be for representation of McNab. Rather, he argues that "discovery and trial preparation were *obviously* necessary to McNab's defense." Trustee's Response at 15 (emphasis added). However, it cannot be determined on the present record whether or not Leighton's counsel divided up its litigation expenses between McNab and Leighton and billed each separately for time spent. Leighton's counsel has represented that this application is only for work performed on behalf of Leighton, while the Trustee has not shown to the contrary. However, the present record is not adequate to permit ruling on this issue.

Special Counsel also argues that Leighton's application is improper as its fee application includes a request for reimbursement for general bankruptcy services. Those protested general bankruptcy services include posting and maintaining the LOC as well as defending its super-priority administrative claim. Such tasks were included in the superpriority claim by the agreed order. Moreover, even if all of Leighton's requested $85,704.50 reimbursement for general bankruptcy services were denied, reimbursement for costs and services expressly covered by the agreed Order far and away exceed the amount of assets in the bankruptcy estate. Thus, the issue of work on general bankruptcy services need not presently (and not likely ever) be reached.

At this time, the funds remaining in the estate are apparently less than one-sixth of Leighton's requested fees. A review of Leighton's counsel's application shows that counsel earned while defending the Adversary at least the amount held by the Trustee.

Leighton's application for disgorgement from Special Counsel cannot yet be determined for reasons stated below. When it is considered, Leighton's application will also be further reviewed at that time to determine what part, if any, pertains to defense of McNab and also to consider objections to general bankruptcy services. At this time, however, Leighton's application for administrative superpriority will be allowed and or-dered to be paid out of all sums currently in the estate subject to its claim. Beyond doubt, the fees and expenses sought for work representing Leighton in areas provided by the agreed Order far exceed such amounts available for payment, as amply demonstrated by uncontested parts of the Application.

## Disgorgement of Interim Fees

 Leighton also requests that all fees previously paid to the Trustee and to Special Counsel in interim awards be disgorged in light of Leighton's superpriority. It is true that orders granting interim fee requests are not final and can be revisited at any time until they are final. *Matz v. Hoseman,* 197 B.R. 635, 639 (N.D.Ill.1996) (award of interim fees is not final and is subject to later review). Special Counsel argues that any request for disgorgement should be brought in the form of an Adversary proceeding. However, Special Counsel cited not authority for this proposition, and none was found. A number of courts, including this Circuit, have reviewed requests for disgorgement without requiring and Adversary proceeding. *See Matter of Taxman Clothing,* 49 F.3d 310 (7th Cir.1995); *In re Gregory,* 214 B.R. 570 (S.D.Tex.1997). Moreover, such a motion may be brought by the Trustee or by a creditor. *See, e.g., United States v. Schottenstein, Zox & Dunn,* 219 B.R. 741 (6th Cir. BAP 1998).

 Disgorgement is a discretionary order and is not mandatory solely because of administrative insolvency. *Matter of Anolik,* 207 B.R. 34 (Bankr.D.Mass.1997); *Schottenstein,* 219 B.R. at 752–53. In this case, it cannot yet be determined whether disgorgement of professional fees from Special Counsel or from the Trustee is appropriate, and further briefing will be required. Leighton's claim to a superpriority was contingent and effective upon Leighton prevailing in the Adversary proceeding, but disgorgement for Leighton's benefit would give its victory retroactive effect not specified in the December 30 Order. It is unclear whether disgorgement of professional fees awarded prior to Leighton's superpriority claim becoming effective is appropriate. Such further briefing should also discuss whether disgorgement, if appropriate, should come before or after all appeal rights are exhausted from the Adversary proceeding.

## CONCLUSION

Leighton is entitled to the administrative superpriority it negotiated for in good faith in the December 30 Order. Thus, Leighton's application for allowance and payment of its administrative claim will be granted. As the estate is now virtually without funds not subject to Leighton's superpriority,[5] no further applications by Trustee's counsel for professional compensation need be considered at this time.

Whether the Trustee should have pursued his Adversary case against Leighton in light of his difficulties in obtaining necessary supporting evidence is not an issue here. The issue is whether, as a result of his agreement to the Order to protect Leighton's litigation expenses in exchange for its agreement to sale, Leighton should now receive the benefit of the agreed protection. It should. Leighton's application for allowance of its superpriority administrative claim against assets held by the Trustee will be granted, and payment will be ordered to the extent of funds in the estate.

---

**5.** A separate memorandum opinion discussing the $2,500 awarded and paid to Special Counsel in interim fees, but not subject to Leighton's superpriority will also be entered this date, and will provide for disgorgement of that $2,500 from which various administrative creditors may be paid.