In the
United States Court of Appeals
For the Seventh Circuit

Nos. 99-1749 & 99-1803

In the Matter of:

    Kids Creek Partners, L.P.,
Debtor.


Appeals of:

    David R. Herzog, Trustee, and Belofsky
    & Belofsky, P.C. (formerly known as
    David A. Belofsky & Associates, P.C.),
    Special Counsel for the Trustee


Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 98 C 3852 (94 B 23947)--Charles P. Kocoras, Judge.


Argued November 29, 1999--Decided January 10, 2000


  Before Bauer, Easterbrook, and Evans, Circuit Judges.

  Easterbrook, Circuit Judge.  When Kids Creek
Partners entered bankruptcy, its only valuable
asset was an option to acquire a 450-acre parcel
of land at a bargain price. In November 1994 Kids
Creek reached an agreement that would result in
the profitable sale of one part of the parcel to
the County of Grand Traverse, Michigan, and
Munson Healthcare. The buyers threatened to call
off the deal unless Kids Creek conveyed
unencumbered title by the end of the year, which
it could do only by persuading Leighton Holdings,
Ltd., to release a mortgage Leighton held on the
entire parcel. Leighton was unwilling to do this
until its debt had been repaid; Kids Creek could
not pay until it had exercised the option and
sold the land, which it could not do without
Leighton's cooperation--for even if the
bankruptcy court had the power to approve the
exercise of the option and a sale free from
Leighton's lien, see 11 U.S.C. sec.363(f)(3), the
lien extended to other interests that could not
be so readily cleared. And Kids Creek did not
want to handle the transaction the most obvious
way--repaying Leighton out of the profits of the
sale--because it contemplated suit against
Leighton on a lender-liability theory and feared
that it might have trouble collecting a judgment
rendered years later. (Leighton is a Cayman

Islands corporation that does not maintain substantial assets in the United States.)

At the very last moment, on December 30, 1994, Leighton and Kids Creek (through David Herzog, its Interim Trustee) struck a bargain. Kids Creek would exercise the option and immediately reconvey the land to the buyers for about $2.9 million; this would produce the $2.1 million needed to repay Leighton, which would release its liens; Leighton would provide Kids Creek with a letter of credit to assure satisfaction of any judgment Kids Creek might secure against Leighton. Bankruptcy Judge Schmetterer entered a lengthy order providing for the purchase and conveyance of the property, payment of the debt, release of the liens, and posting of the letter of credit. A handwritten addendum (initialed by Judge Schmetterer) provides:

> If the Trustee initiates such a lawsuit and [Leighton] prevails, then [Leighton] shall have an allowed super-priority administrative claim, prior to the claim of any holder of a claim otherwise allowable under section 507(a) of the Bankruptcy Code, for (a) all costs and fees associated with the issuance of the letter of credit; (b) all legal fees and expenses incurred in the defense of the lawsuit; (c) all other fees and expenses reasonably incurred in connection with the collection of [Leighton's] claim; and (d) any and all funds previously drawn by the Trustee under the letter of credit, together with interest at [Leighton's] contractual default rate.

The deal closed, leaving Kids Creek with approximately $500,000 in cash to satisfy creditors other than Leighton. (The surplus was less than $800,000, because Kids Creek had to pay the seller of the land.) Instead of paying its debts, Kids Creek (through Herzog, by then the permanent Trustee) decided to use the money to fund a suit (technically an adversary proceeding in the bankruptcy) against Leighton, which prevailed after a lengthy battle. Herzog v. Leighton Holdings, Ltd., 212 B.R. 898 (Bankr. N.D. Ill. 1997), affirmed, 239 B.R. 497 (N.D. Ill. 1999). Judge Schmetterer summed up:

> Plaintiff complains that the [real estate development] project was doomed by the refusal of Leighton as lender to fund the last advance involved in a series of loans. But the evidence showed that the project failed due to mismanagement, breach of contractual obligations owed by Debtor to the lender, a lower offered sale

> price than was hoped for, and [a] capital
> gains tax problem, among other reasons not
> caused by Defendants. If the final loan
> advance had been extended, the project
> still would have failed, and there were
> ample contractual grounds to deny the
> final funding.

212 B.R. at 904. Having kept its part of the bargain by maintaining the letter of credit throughout the litigation, Leighton called on Kids Creek to reimburse its costs and attorneys' fees. As a practical matter this meant turning over the estate's remaining assets. But Trustee Herzog and the law firm he hired to prosecute the suit (Belofsky & Belofsky, P.C.) contended that their bills should be paid instead. By this time, all thought of distributing anything to Kids Creek's original creditors and investors had evaporated; Herzog had devoted all of the estate's assets to the doomed suit against Leighton. Herzog and the Belofsky firm contended that the deal with Leighton in 1994 is invalid because the Code does not allow such a super-priority administrative claim.

Judge Schmetterer was not amused by this belated attempt to turn a business arrangement into the equivalent of a gift by Leighton to its adversaries. He ordered the estate's remaining assets distributed to Leighton, leaving Herzog and the Belofsky firm without compensation for their services. 220 B.R. 963 (Bankr. N.D. Ill. 1998). (In a later order, the bankruptcy judge required Herzog and the law firm to disgorge all interim fees they had received. 236 B.R. 871 (Bankr. N.D. Ill. 1999).) Because Leighton's claim substantially exceeds the estate's remaining assets, Judge Schmetterer did not have any occasion to conduct a close analysis of its claim; even the lowest estimate of reasonable attorneys' fees exceeds what is available for distribution. District Judge Kocoras affirmed, 233 B.R. 409 (N.D. Ill. 1999), holding that Herzog and the Belofsky firm are estopped to contest the validity of the 1994 super-priority order. Other creditors might be entitled to object, for they did not receive notice of the December 30 proceeding at which the order was entered. But Herzog negotiated and approved the order, and the law firm undertook the representation with knowledge of it. They are in no position to complain, the judge held. And of course no one else has appeared to protest; unsecured creditors (and the original partners) know that their claims are worthless and have no interest in the dispute among administrative claimants.

Herzog and the Belofsky firm devote much of

their appeal to semantic quibbles. Why, it was the Interim Trustee and his Counsel who approved the deal in 1994, they say. Neither the Interim Trustee nor his Counsel is a claimant today. Rather it is the Trustee and the estate's Special Counsel who seek payment. That the Trustee and the Interim Trustee are the same person, and that the Interim Trustee's lawyer later joined the Belofsky firm, are dismissed as mere details. Yet if arrangements to which an interim trustee gave consent may be avoided as soon as the permanent trustee is appointed, then contracts with debtors in bankruptcy would be worthless, and estates in bankruptcy would be worse off. No one wants to transact with an entity that may repudiate its promise. Once an interim trustee has (with judicial approval) made a bargain on behalf of an estate in bankruptcy, then the estate is bound. Replacing one trustee with another may change who speaks for the estate in the future, but it does not alter the estate's obligations. As for the fact that the Special Counsel was appointed after the 1994 arrangement: a lawyer takes his client as he finds it. If the estate lacks the assets to pay for the legal services, then the lawyer has agreed to work on contingent fee. That was Kids Creek's situation when Belofsky & Belofsky signed on as Special Counsel in 1995. If the estate sued Leighton and won, then the Belofsky firm could expect full compensation; but if it sued and lost, then the firm had to expect little or no compensation, because Leighton would have first claim. This is an ordinary transaction for the plaintiffs' bar, and the firm must accept the consequences.

Herzog and the Belofsky firm advance many reasons why, in their view, even their personal consent should not be enough to validate Leighton's super-priority claim. The district court found these arguments wanting; we find them irrelevant, because, once Herzog failed to appeal from the December 30 order, all claims that could have been raised at that time were forfeited. If the December 30 order was a final decision, appealable to the district court under 28 U.S.C. sec.158(a), then failure to take a timely appeal puts that order beyond review. The district judge thought that the order was not final because its full effects could not be known until later: whether the estate would sue Leighton, and if so whether Leighton would prevail, and if it prevailed the amount of its super-priority claim, all depended on events that postdated the order. That's true enough, but why does it render the order non-final?

Think of a judgment in a quiet-title action: the judge decrees that A has a life interest in the property, with remainder to B and C in that

order. C could appeal immediately, contending that he should be superior to B-- even though B may predecease A, so that the sequence between B and C turns out not to matter. An order in a declaratory judgment action concerning insurance coverage requiring Insurer to indemnify Insured if it should lose an underlying tort suit is appealable, even though Insured may win the suit. An order specifying that Insurer must provide coverage (i.e., that a policy is valid) is appealable even though Insured may never suffer a casualty and even though, if it does, the nature of the casualty and the amount of the loss are variable. Coverage itself has value; indeed, coverage is a property right, valuable to someone who fears that a bad event may happen. A judgment that A must indemnify B if a described event occurs--a standard disposition of a declaratory-judgment action about the scope or validity of an insurance policy-- is final and appealable when entered. The order of December 30 is similar; it gives Leighton assurance that if a specified event occurs, then indemnity will be forthcoming. Provision for indemnity is the kind of order that would be final in a stand-alone suit outside of bankruptcy.

Orders of the form "if X, then Y" are common in litigation. They are routinely treated as immediately appealable, so that the nature of the property rights these orders determine may be respected; indeed it would be absurd to say that the finality of such a judgment depends not on when it is entered, but on when (if at all) event X occurs. The decision of December 30, 1994, is an "if-then" order: if Leighton is sued and prevails, then its expenses are treated as a super-priority administrative claim. Such an order is final, and appealable, if an order establishing a creditor's priority is generally appealable even though the amount of the claim, and its value given other creditors' claims, remain to be determined. And a priority-fixing order is indeed treated as final under sec.158. See, e.g., In re Morse Electric Co., 805 F.2d 262 (7th Cir. 1986).

Perhaps the trustee could reply that an if-then disposition is not final when the additional contingencies occur in the same litigation. See McMunn v. Hertz, 791 F.2d 88, 90 (7th Cir. 1986); In re Lytton's, 832 F.2d 395, 399-400 (7th Cir. 1988); State Street Bank v. Brockrim, 87 F.3d 1487 (1st Cir. 1996). But bankruptcy comprises many disparate proceedings that would not be a single case in ordinary litigation and are not lumped together to determine finality. That's the essential conclusion of Morse Electric. The super-priority order was entered as part of the core bankruptcy proceeding; the claim by the

Trustee against Leighton was an adversary proceeding that for our purposes might as well have been a separate suit. The best way to understand the proceedings, we think, is that Leighton sought and obtained in the core bankruptcy case an indemnity agreement whose full effect depended on the outcome of a separate adversary proceeding. Because the decision in the core case finally determined Leighton's priority, it was appealable under the rationale of Morse Electric.

There is another reason why the order of December 30 was final. The super-priority clause is part of a comprehensive order that includes a direction to exercise the option, sell the property, and distribute the proceeds in a particular way. Usually we ask whether a decision is "final," not whether an isolated passage standing alone would be final. The administrative super-priority cannot be divorced from the sale, for it is a condition of the sale. If an order approving a sale of property from an estate in bankruptcy is final, then any dispute about the conditions attached to the sale must be appealed at the same time. It would undermine the validity of the interests transferred by the sale to allow an appeal about the conditions to be deferred. So all we need to decide is the basic question: is an order approving the sale of assets from an estate in bankruptcy final under sec.158? The answer is yes. In re Gould, 977 F.2d 1038 (7th Cir. 1992); In re Met-L-Wood Corp., 861 F.2d 1012 (7th Cir. 1988); In re Sax, 796 F.2d 994 (7th Cir. 1986).

Requiring an immediate appeal makes good sense. How could estates in bankruptcy reach beneficial arrangements for the sale of their assets if terms and conditions crucial to the transaction could be reopened years later? Only a fool would deal with the estate under those circumstances, and the estate's inability to make conclusive arrangements would reduce the amount available for distribution to creditors. Thus we do not ask whether the super-priority order was authorized by the Code, or whether the use of the power to create such interests (if that power exists) was prudently exercised here; nor do we ask whether some equitable principle prevents Herzog and the Belofsky firm from welching on their promise. Instead we hold that once the period for appeal expired early in 1995, any party who had notice of the December 30 order was forever barred from questioning its terms. That the Interim Trustee agreed to the order, and therefore could not appeal because he was not aggrieved by it, does not permit a later appeal; it shows instead that the Trustee simply had to live with it, rather than wage what amounts to a collateral attack

after losing the adversary action against Leighton.

Events since the expiration of the time for appeal may create separate controversies. Just as a declaratory judgment resolving an insurance coverage issue would not be conclusive on a later dispute about the valuation of the casualty, so the order of December 30, 1994, would not be conclusive on a dispute about the reasonableness of Leighton's fees and costs. As we have mentioned, the assets available for distribution are less than any amount that would be deemed reasonable, so no dispute of this kind has arisen. But the Belofsky firm does contend that it is entitled to keep $2,500 that it received as a sanction in the adversary proceeding. The bankruptcy judge ordered Cecil McNab, one of the defendants in the adversary proceeding, to pay $2,500 to the law firm as a sanction under Fed. R. Civ. P. 37(a)(4)(A) (applied to bankruptcy cases by Fed. R. Bankr. P. 7037). If the award was property of the Kids Creek estate, then it must be turned over for the benefit of other administrative creditors. This is what the bankruptcy judge and the district judge concluded. But if the money never became Kids Creek's property, then the turnover order was mistaken.

Rule 37(a)(4)(A) provides that "the court shall, after affording an opportunity to be heard, require the party or deponent whose conduct necessitated the motion [to compel] . . . to pay to the moving party the reasonable expenses incurred in making the motion, including attorney's fees" (emphasis added). Payment is to "the moving party"--which is to say the litigant, for a law firm is an agent, not a "party" to the case. This is the norm; fees awarded under fee-shifting statutes belong to the litigant, not the lawyer, though the litigant may agree by contract to pass them on to the lawyer. See Central States Pension Fund v. Central Cartage Co., 76 F.3d 114 (7th Cir. 1996). Here the moving party was the bankruptcy estate of Kids Creek, so the award is property of the estate under 11 U.S.C. sec.541. Any agreement by the estate to remit those funds to its law firm is subject to the claims of other creditors, and Leighton holds a higher priority.

Affirmed